*954 OPINION
BERZON, Circuit Judge:
Idaho has banned “job targeting” or “market recovery” programs. Construction unions have developed such programs to increase their members’ access to work and stem the long-term decline in the percentage of construction workers represented by unions. Under such programs, a union collects funds from workers it represents and then uses those funds to subsidize bids by union contractors, allowing the contractors to lower their labor costs and so more effectively compete with nonunion contractors. The plaintiffs, two Idaho unions, brought suit to enjoin the statute as preempted by the National Labor Relations Act (“NLRA”), 29 U.S.C. § 151 et seq. The district court preliminarily enjoined Idaho’s statute and then granted summary judgment to the unions.
It is well settled that most of the conduct prohibited by Idaho’s statute is protected by the NLRA. As to the balance of the prohibited conduct — namely, the use of job targeting funds derived in part from wages earned on federal projects governed by the Davis-Bacon Act, 40 U.S.C. § 3141 et seq. — Idaho’s proposed enforcement of federal rules governing wages on federal projects, including criminal penalties more onerous than the federal statute’s own civil and administrative enforcement provisions, is likely preempted by Davis-Bacon itself. In any event, the decisions of the National Labor Relations Board (the “NLRB” or “Board”) make clear that the distribution of funds derived in part from. Davis-Bacon wages is at least arguably protected by the NLRA, and so preempted under one strain of NLRA preemption law. We therefore affirm in relevant part.
I.
The Idaho “Fairness in Contracting Act” (“the Act”) provides in relevant part that:
(2) No contractor or subcontractor may directly or indirectly receive a wage subsidy, bid supplement or rebate on behalf of its employees, or provide the same to its employees, the source of which is wages, dues or assessments collected by or on behalf of any labor organization(s), whether or not labeled as dues or assessments.
(3) No labor organization may directly or indirectly pay a wage subsidy or wage rebate to its members in order to directly or indirectly subsidize a contractor or subcontractor, the source of which is wages, dues or assessments collected by or on behalf of its members, whether or not labeled as dues or assessments.
(4) It is illegal to use any fund financed by wages collected by or on behalf of any labor organization(s), whether or not labeled as dues or assessments, to subsidize a contractor or subcontractor doing business in the state of Idaho.
Idaho Code § 44-2012(2)-(4). A violation of the Act is a misdemeanor punishable by a fine of up to $10,000 for a first violation, $25,000 for a second violation, and $100,000 for each additional violation. Id. § 44-2012(5). The Act also establishes a private cause of action available to a range of parties, including any interested taxpayer, to civilly enforce the Act. Id. § 44-2012(6).
The Act prohibits “job targeting” programs, also known as “market recovery” programs. Unions have developed such programs in the face of the dwindling share of the construction market held by union contractors and the associated decline in union membership in the construction industry. The programs’ goal is to increase their members’ access to employment and spread the benefits of collectively-bargained wages. See generally, Herbert R. Northrup & Augustus T. White, Subsidizing Contractors to Gain Employ *955 ment: Construction Union “Job Targeting”, 17 Berkeley J. Emp. & Lab. L. 62 (1996).
The essentials of such job targeting programs are straightforward. A union collects funds from workers, generally a percentage of their wages, and then uses that money to subsidize a union contractor’s payment of wages at the collectively bargained rate on a project which the union has “targeted.” So, for example, a union might agree that a union-affiliated contractor may submit a bid based on a $15/ hour pay rate to compete successfully against non-union contractors on that particular project. If the contractor’s bid,is accepted, then the union will pay the difference between the agreed-on rate and the normal union wage; in this example, if the normal wage is $20/hour, the union would pay $5/hour out of its job targeting fund. The result is that the union-affiliated contractor is able to bid successfully on a project that would otherwise go to a non-union contractor; union members accordingly have access to the jobs on that project, which would otherwise go to employees of non-union companies; and the members working on those jobs are paid the ordinary union rate, rather than the lower wage on which the contractor based his bid.
The mechanics of job targeting programs vary, both in how the funds are collected and how they are distributed. Funds are typically collected by the contractor through a mandatory or voluntary deduction from workers’ wages and then deposited into a special job targeting fund controlled by the union. See J.A. Croson Co., 359 N.L.R.B. No. 2, 2012 WL 5246914 (2012); Int’l Bhd. of Elec. Workers, Local 48, 332 N.L.R.B. 1492 (2000), modified 333 N.L.R.B. No. 122, enforced, 345 F.3d 1049 (9th Cir.2003) (“Kingston Constructors ”). In some cases, however, workers pay the funds directly to the union. See Int’l Bhd. of Elec. Workers, Local 357 v. Brock, 68 F.3d 1194, 1201-02 (9th Cir.1995). As to distribution, the subsidy may be paid to the contractor, with the contractor paying the worker the full union wage; or the subsidy may be paid directly to the worker, with the contractor paying less than the ordinary union wage, and the union’s payment making up the balance.[1]
II.
Before the Act went into effect, The Idaho Building and Construction Trades Council, AFL-CIO, and Southwest Idaho Building and Construction Trades Council, AFL-CIO (collectively, the “Trades Councils”), brought this facial challenge against the Attorney General of Idaho to enjoin its enforcement.[2] The district court granted a preliminary injunction against the enforcement of the Act. The parties then filed cross-motions for summary judgment.
*956 The Inland pacific Chapter of the Associated Builders and Contractors, Inc. (“ABC”), which supported the Act’s passage in the legislature, sought to intervene as a defendant in the summary judgment proceedings. The court denied the motion to intervene but permitted ABC to appear as an amicus curiae.
The district court granted summary judgment to the Trades Councils and denied it to the Attorney General, concluding that the Act was preempted by the NLRA. The Attorney General timely appealed.[3] After a limited remand and supplemental briefing on jurisdictional issues not pertinent to this portion of the appeal, the case was resubmitted for disposition on the merits as to the Act.
III.
“Although the NLRA itself contains no express pre-emption provision,” the Supreme Court has held that “Congress implicitly mandated two types of pre-emption as necessary to implement federal labor policy.” Chamber of Commerce of U.S. v. Brown, 554 U.S. 60, 65, 128 S.Ct. 2408, 171 L.Ed.2d 264 (2008). With regard to the Act, the Trades Councils urge only one of those two preemption strands: the theory articulated in San Diego Building Trades Council, Millmen’s Union, Local 2020 v. Garmon, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959).[4]
“Garmon pre-emption ‘is intended to preclude state interference with the National Labor Relations Board’s interpretation and active enforcement of the integrated scheme of regulation established by the NLRA.’ ” Brown, 554 U.S. at 65, 128 S.Ct. 2408 (quoting Golden State Transit Corp. v. City of Los Angeles, 475 U.S. 608, 613, 106 S.Ct. 1395, 89 L.Ed.2d 616 (1986)) (some internal quotation marks omitted). “To this end, Garmon pre-emption forbids States to ‘regulate activity that the NLRA protects, prohibits, or arguably protects or prohibits.’ ” Id. (quoting Wisc. Dep’t of Indus. v. Gould Inc., 475 U.S. 282, 286, 106 S.Ct. 1057, 89 L.Ed.2d 223 (1986)).
To eliminate the “danger of conflict” and the “potential frustration of national purposes,” Garmon provides that, “[w]hen it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by § 7 of the [NLRA], or constitute an unfair labor practice under § 8, due regard for the federal enactment requires that state jurisdiction must yield.” 359 U.S. at 244, 79 S.Ct. 773.[5] The doctrine, “based predominantly on the primary jurisdiction” of the 'NLRB, was devised in light of “experi *957 ence ... that [various alternative] methods sacrificed important federal interests in a uniform law of labor relations centrally administered by an expert agency without yielding anything in return by way of predictability or ease of judicial application.” Lodge 76, Int’l Ass’n of Machinists v. Wisc. Emp’t Relations Comm’n, 427 U.S. 132, 138-39, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976) (quoting Amalgamated Ass’n of Street, Elec. Ry. & Motor Coach Emps. v. Lockridge, 403 U.S. 274, 290-91, 91 S.Ct. 1909, 29 L.Ed.2d 473 (1971)); see also Retail Prop. Tr. v. United Bhd. of Carpenters & Joiners, 768 F.3d 938, 951 (9th Cir.2014).
With one notable exception addressed to the facial nature of this challenge, the Attorney General does not contest that the Act is Garmon preempted. With good reason. The NLRB has repeatedly held that job targeting programs are actually protected under § 7 of the NLRA. See J.A. Croson Co., 2012 WL 5246914 at *5; Kingston Constructors, 332 N.L.R.B. at 1496-97; Assoc’d Builders & Contractors, Inc., 331 N.L.R.B. 132, 137 (2000), modified as to remedy, 333 N.L.R.B. 955 (2001); Manno Elec., Inc., 321 N.L.R.B. 278, 298 (1996). Most recently, the Board reaffirmed its earlier cases by explaining that “the objectives of job targeting programs fall squarely within the ambit of Section 7 of the Act,” which “protects concerted employee activities engaged in ‘for the purpose of collective bargaining or other mutual aid or protection.’ ” J.A. Croson Co., 2012 WL 5246914 at *6 (quoting Eastex, Inc. v. NLRB, 437 U.S. 556, 565-66, 98 S.Ct. 2505, 57 L.Ed.2d 428 (1978)).
We “defer to the NLRB’s interpretation of the NLRA” where, as here, “its interpretation is rational and consistent with the statute.” SEIU, United Healthcare Workers-W. v. NLRB, 574 F.3d 1213, 1214 (9th Cir.2009) (internal quotation marks omitted) (quoting UFCW, Local 1036 v. NLRB, 307 F.3d 760, 766 (9th Cir.2002)). The Board’s interpretation of the NLRA on this score is eminently rational and consistent with the statute. “It is settled that [§ 7’s] protections encompass employee attempts ‘to improve terms and conditions of employment’ with their employer as well as attempts to otherwise ‘improve their lot ... through channels outside the immediate employee-employer relationship.’ ” J.A. Croson Co., 2012 WL 5246914 at *6 (quoting Eastex, Inc., 437 U.S. at 565-66, 98 S.Ct. 2505). As the Board has explained:
The job targeting program is effectively a union’s agreement with an employer to accept a pay cut in order to avoid layoffs or expand job opportunities for represented employees—a bargain that surely lies at the heart of activity protected by Section 7 of the Act. But in the construction industry, an employer often cannot guarantee that it can comply with its end of such a bargain because it must ordinarily bid for work through a competitive process. A union might agree to a pay cut on some jobs in order to secure its members employment on others only to have the employer fail to obtain the work. The job targeting program solves that unique problem by allowing the union to hold the wages donated by employees specifically for this purpose until the employer secures the additional work. The strategy of job targeting to preserve and expand employment opportunities for represented employees thus plainly seeks to further legitimate goals under Section 7.
Id. We agree with the Board that, as a general matter, job targeting programs are a form of collective action aimed at increasing opportunities for union members and so fall within the scope of § 7.
While the Attorney General declines to offer a wholesale defense of the *958 Act, amici contend that the Act, in all its applications, escapes preemption notwithstanding the protections accorded by § 7 of the NLRA. We address, and reject, these broad arguments before turning to the Attorney General’s more limited contention.
ABC argues that the Act is saved from preemption by § 14(b) of the NLRA, 29 U.S.C. § 164(b). Section 14(b) provides that, “Nothing in this subchapter shall be construed as authorizing the execution or application of agreements requiring membership in a labor organization as a condition of employment in any State or Territory in which such execution or application is prohibited by State or Territorial law.” Id. Section 14(b) thus allows states to enact bans on certain agreements between unions and employers — ones requiring membership in labor organizations as a condition of employment. See Oil, Chem. & Atomic Workers Int’l Union v. Mobil Oil Corp., 426 U.S. 407, 409 & nn. 1 & 2, 416-17, 96 S.Ct. 2140, 48 L.Ed.2d 736 (1976). Idaho has enacted such a law. Idaho Code § 44-2003(2).
Idaho codified the Fairness in Contracting Act under the heading “Right to Work,” see Idaho Code §§ 44-2001 et seq., alongside § 44-2003(2), a provision that bans precisely the types of agreements covered by § 14(b). Consequently, ABC contends, the Act is blessed by § 14(b) and freed from preemption.
ABC overreads the scope of § 14(b), which “does not protect a state statute which is so broadly stated or construed.” NLRB v. Tom Joyce Floors, Inc., 353 F.2d 768, 770 (9th Cir.1965). Section 14(b) refers only to certain labor-management agreements — those requiring membership in a labor organization. As the Supreme Court has made clear, § 14(b) does not allow states to ban agreements other than those described in the statute: “There is nothing in either § 14(b)’s language or legislative history to suggest that there may be applications of right-to-work laws which are not encompassed under § 14(b) but which are nonetheless permissible.” Oil, Chem. & Atomic Workers, 426 U.S. at 413 n. 7, 96 S.Ct. 2140. Because no agreement of the sort specifically covered by § 14(b) is at issue in this case, and because “§ 14(b) should not be read as granting states ... general power to supplant federal labor law,” NLRB v. Pueblo of San Juan, 276 F.3d 1186, 1200 (10th Cir.2002), we conclude that § 14(b) has no bearing on this case.
We likewise reject the argument of a second amicus, the National Right to Work Legal Defense Foundation (“RTW”), that the Act escapes preemption because it is simply a regulation of the “monies and substantive benefits that may be exchanged between employers and employees.”
For one thing, RTW’s argument is not responsive to the kind of preemption at issue in this case, namely Garmon preemption. Under a Machinists analysis, see supra note 4, the NLRA does not ordinarily preempt state laws of general applicability governing the “particular substantive terms” that might be the subject of collective bargaining. Metro. Life Ins. Co. v. Massachusetts, 471 U.S. 724, 753, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985). Thus, for example, the Court has upheld state statutes of general applicability establishing minimum labor standards. See id. at 755, 105 S.Ct. 2380; Fort Halifax Packing Co. v. Coyne, 482 U.S. 1, 19-23 & n. 15, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987); see also Assoc. Builders & Contractors of S. Cal., Inc. v. Nunn, 356 F.3d 979, 989 (9th Cir.) (noting that “state minimum benefit protections have repeatedly survived Machinists preemption challenges”) (quoting Nat’l Broad. Co. v. Bradshaw, 70 F.3d 69, 71 (9th Cir.1995) (internal quotation *959 marks omitted)), amended by, 2004 WL 292128 (9th Cir.2004). Garmon preemption is an entirely distinct doctrine, however, focused mainly on protecting the NLRB’s primary jurisdiction. If in particular circumstances the application of such general labor standards would be actually or arguably protected or prohibited, the Metropolitan Life line of cases does not preclude Garmon preemption.
Moreover, the Act is completely unlike the even-handed requirements permitted in the cases upon which RTW relies. It does not establish a rule regarding substantive protections for employees generally, union and nonunion. Instead, it facially singles out unions, seeking to ban a particular strategy they employ “to avoid layoffs or expand job opportunities for represented employees.” J.A. Croson Co., 2012 WL 5246914 at *6. That the unions’ strategy for effectuating their “legitimate goals under Section 7” of the NLRA, id., happens to involve, in some instances, providing higher wages and benefits to employees than would otherwise be the case, is of no import. Because “the objectives of job targeting programs fall squarely within the ambit of Section 7,” id., the Act cannot escape preemption as a purportedly evenhanded wage regulation.
IV.
We arrive at the crux of this case. The Attorney General contends that this facial challenge must fail, even though the Act is largely preempted, because it is not entirely so. There are some legitimate applications of the Act, he contends, because the NLRA does not actually or arguably protect job targeting programs funded through wages paid on jobs subject to the requirements of the Davis-Bacon Act, 40 U.S.C. § 3141 et seq[6] Because, he argues, the Trades Councils cannot establish “that no set of circumstances exists under which the Act would be valid,” United States v. Salerno, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987), the Act is facially valid.
The parties agree that we should apply the Salerno standard.[7] Applying it, without deciding whether it is the proper standard, we conclude that the Act is facially invalid because it is preempted by the NLRA.
A.
The Davis-Bacon Act requires that the bid specifications for certain federal public-works projects provide that workers be paid at least the “prevailing wage,” as determined by the Secretary of Labor, for similar work in the relevant state. 40 U.S.C. § 3142(a)-(b). The Act further provides that:
the contractor or subcontractor shall pay all mechanics and laborers employed directly on the site of the work, unconditionally and at least once a week, and without subsequent deduction or rebate on any account, the full amounts accrued at time of payment, computed at wage rates not less than those stated in the advertised specifications, regardless of any contractual relationship which may be alleged to exist between the contractor or subcontractor and the laborers and mechanics.
Id. § 3142(c)(1). “The Davis-Bacon Act was intended as a general prohibition or *960 command to a federal agency to require minimum wage stipulations for federal government work contracts.” Operating Eng’rs Health & Welfare Trust Fund v. JWJ Contracting Co., 135 F.3d 671, 676 (9th Cir.1998) (internal quotation marks omitted); see also Univs. Research Ass’n, Inc. v. Coutu, 450 U.S. 754, 771-72, 101 S.Ct. 1451, 67 L.Ed.2d 662 (1981). The Department of Labor (“DOL”) regulations promulgated to effectuate Davis-Bacon provide that some deductions from the wages due the employees, such as those made for purposes of income tax withholding or as contributions to a retirement account, are permissible. 29 C.F.R. § 3.5.[8] Deductions not specifically permitted are prohibited. 29 C.F.R. § 3.9.
Several cases have held that collecting funds for job targeting programs from wages earned on Davis-Bacon jobs violates the Davis-Bacon Act. See Brock, 68 F.3d at 1201; In re Bldg. & Constr. Trades Unions Job Targeting Programs, Case No. 90-02, 1991 WL 494718 (Wage App. Bd. June 13, 1991) (“Building Trades ”), aff'd sub nom. Bldg. & Const. Trades Dep’t v. Reich, 40 F.3d 1275, 1277 (D.C.Cir.1994).[9]
The Attorney General leans on this line of authority, arguing that it establishes that job targeting programs are generally illegal under Davis-Bacon and therefore are not arguably protected under § 7 of the NLRA. We disagree for two reasons. First, the only applications of the statute which the Attorney General defends are those that' amount, in essence, to state enforcement, with criminal sanctions, of Davis-Bacon; any such enforcement would most likely be preempted by Davis-Bacon itself, and so cannot qualify as a “set of circumstances ... under which the Act would be valid.” Salerno, 481 U.S. at 745, 107 S.Ct. 2095. Second, in any event, the NLRB’s precedents regarding job targeting programs and Davis-Bacon establish that the conduct at issue is at least arguably protected by the NLRA.
B.
Davis-Bacon governs wages on federal public works contracts. The application of Idaho’s statute to situations in which Davis-Bacon wages are involved, because the use of Davis-Bacon wages for such programs is purportedly in violation of the Davis-Bacon Act, would amount to the enforcement of the federal Davis-Bacon Act by the State of Idaho.- Idaho can, however, point to no legitimate state interest in enforcing the federal government’s wage rules with regard to federal projects and contracts.
Rather, it is for the federal government (and, at least in some situations, the affected workers) to decide if, when, and how to enforce the provisions of Davis-Bacon. To that end, the Davis-Bacon Act provides for civil and administrative remedies against contractors that violate the its provisions. So, for example, each contract governed by Davis-Bacon must provide that, upon discovering a Davis-Bacon wage violation, “the Federal Government ... may terminate the contractor’s right to proceed with the work or the part of the work as to *961 which there has been a failure to pay the required wages,” and the contractor and its sureties are liable for extra costs the government thereby incurs. 40 U.S.C. § 3143. ■ Likewise, the Davis-Bacon Act establishes a list of persons who have “disregarded their obligations to employees and subcontractors,” and are therefore barred from receiving federal contracts for three years. Id. § 3144(b). DOL’s regulations also provide for administrative enforcement of the Davis-Bacon Act. See, e.g., 29 C.F.R. §§ 5.6, 5.7, 5.9, 5.11, 5.12.
Federal law does not establish criminal penalties for violations of Davis-Bacon. See United States v. Clark, 787 F.3d 451, 458 (7th Cir.2015) (noting, in case involving charges of making false statements, that “Davis-Bacon Act violations are not themselves criminal”). The Copeland Act, 18 U.S.C. § 874, provides criminal penalties for conduct related' to Davis-Bacon—but only for “forcing employees to ‘kickback’ wages to their employer.” Brock, 68 F.3d at 1198 (emphasis added); see also Reich, 40 F.3d at 1279. Davis-Bacon, by contrast, prohibits “a broader array of praetiees[,] including but not limited to kickbacks.” Brock, 68 F.3d at 1199. There is no criminal penalty for violations of that broader range of conduct proscribed by Davis-Bacon.
The Attorney General’s proposed application of the Act would amount to state enforcement of a federal statute governing the federal government’s proprietary affairs. In other words, the Act “adds a state-law penalty for conduct proscribed by federal law.” Arizona v. United States, - U.S. -, 132 S.Ct. 2492, 2501, 183 L.Ed.2d 351 (2012). Further, the penalty Idaho seeks to impose—a misdemeanor criminal conviction resulting in fines of up to $100,000 per violation, Idaho Code § 442012(5)—goes far beyond the civil and administrative responses provided by federal law. Not only does the state of Idaho propose to enforce a statute which it has no business enforcing, but it seeks to do so with criminal penalties far more severe than the non-criminal remedies of federal law.
In this respect, the Attorney General’s proposed application of the Act is reminiscent of the state criminal penalty for failure to register as a noncitizen held preempted by the Supreme Court in Arizona. Here, as in Arizona, “[t]he federal statutory directives provide a full set of standards ..., including the punishment for noncompliance,” such that “even complementary state regulation is impermissible.” 132 S.Ct. at 2502. “If [the Act] were valid, every State could give itself independent authority to prosecute federal [Davis-Bacon] violations, ‘diminish[ing] the [Federal Government’s control over enforcement’ and ‘detracting] from the integrated scheme of regulation created by Congress.’ ” Id. (some alterations in original) (quoting Gould, 475 U.S. at 288-89, 106 S.Ct. 1057) (some internal quotation marks omitted).
Indeed, “[w]ere [the Act] to come into force, the State would have the power to bring criminal charges against individuals for violating a federal law even in circumstances where federal officials in charge of the comprehensive scheme determine that [enforcement] would frustrate federal policies.” Id. at 2503. DOL certainly has discretion to determine which Davis-Bacon violations it pursues for enforcement, and has specifically indicated that it “would not take exception” to certain job targeting programs. Brock, 68 F.3d at 1202 n. 6 (quoting a letter from the Administrator of DOL Wage and Hour Division) (internal quotation marks omitted). The Act, however, would prohibit and penalize the very programs as to which DOL has decided not to pursue enforcement. g Moreover, “[e]ven where federal authorities believe *962 [enforcement] is appropriate, there is an inconsistency between [the Act] and federal law with respect to penalties,” as the former provides for large criminal fines while the latter does not. Arizona, 132 S.Ct. at 2503.
We need not decide any precise contours regarding the scope of Davis-Bacon preemption. Suffice it to say that the applications of the Act on which the Attorney General relies would most likely be preempted by Davis-Bacon. We therefore cannot agree that they amount to a “set of circumstances ... under which the Act would be valid.” Salerno, 481 U.S. at 745, 107 S.Ct. 2095.
C.
Moreover, even restricting our inquiry to the NLRA itself, we conclude that the Act is wholly preempted. The question presented by the Attorney General’s argument is whether “the NLRA ... arguably protects” the job targeting programs banned by the Act if those programs are funded in part from wages earned on Davis-Bacon jobs. Brown, 554 U.S. at 65, 128 S.Ct. 2408 (internal quotation marks omitted). If such programs are arguably protected, then Idaho “must defer to the exclusive competence of the [NLRB] if the danger of state interference with national policy is to be averted.” Garmon, 359 U.S. at 245, 79 S.Ct. 773. To prevail, “a party asserting pre-emption” under Garmon’s “arguably standard need only “advance an interpretation of the Act that is not plainly contrary to its language and that has not been ‘authoritatively rejected’ by the courts or the Board.” Int'l Longshoremen’s Ass’n v. Davis, 476 U.S. 380, 395, 106 S.Ct. 1904, 90 L.Ed.2d 389 (1986) (quoting Marine Eng’rs v. Interlake S.S. Co., 370 U.S. 173, 184, 82 S.Ct. 1237, 8 L.Ed.2d 418 (1962)).[10]
Because Garmon preemption turns on what the NLRA actually or arguably requires (or prohibits), we do not look, in the first instance, to authority interpreting Davis-Bacon, such as that cited by the Attorney General. Instead, we look principally to the decisions of the NLRB to decide whether Garmon preemption applies.
Job targeting programs involve two components: funds are collected, in a variety of ways, from workers’ wages, and funds are then distributed, also in various ways, to subsidize union wages on targeted projects. The NLRB has held that, because “requiring the payment of [job targeting] dues as a condition of employment on Davis-Bacon projects” violates Davis-Bacon, such collection of funds “is inimical to public policy.” Kingston Constructors, 332 N.L.R.B. at 1500.[11] Therefore, Kingston Constructors concluded, the union at issue in that case could not lawfully require its members to pay the challenged job targeting dues.
But the Idaho Act at issue in this case does not address itself to a union’s collec *963 tion of funds. Rather, the Act prohibits contractors from “receiving] a wage subsidy, bid supplement or rebate”; prohibits unions from “pay[ing] a wage subsidy or wage rebate”; and prohibits, generally, the “use” of funds collected by or on behalf of a union “to subsidize a contractor or subcontractor.” Idaho Code § 44-2012(2) — (4) (emphasis added). The Act stipulates that all such actions are prohibited only with regard to funds “the source of which is wages, dues or assessments collected by or on behalf of any labor organization(s).” Idaho Code § 44-2012(2). Still, the actions prohibited by the Act are the distribution of funds, not their collection.
No NLRB case has held collective action by employees to subsidize wages on non-Davis-Bacon jobs by distributing funds to the workers or employers on those jobs is not protected concerted activity under § * 7 because of the source of those funds. As to distribution of funds derived from Davis-Bacon wages, the NLRB, far from holding that the use of funds collected from Davis-Bacon wages is unprotected under § 7 of the NLRA, once held that use protected in some circumstances and, more recently, has specifically reserved the question.
In Re Can-Am Plumbing, Inc., 335 NLRB 1217, 1217 (2001) (“Can-Am I”), petition granted, 321 F.3d 145 (D.C.Cir.2003) (“Can-Am II”), held that “prosecuting] a state court lawsuit against [a] competitor employer ... for accepting job targeting program funds” from a union was an unfair labor practice under § 8, because the program itself was protected under § 7. That was so despite “[t]he Board’s recent holding in Kingston Constructors that unions may not lawfully exact dues from employees working on Davis-Bacon projects to support job targeting programs.” Id. (citation omitted). Can-Am I went on to explain that the targeted job was not a Davis-Bacon project and that the challenged contractor had never worked on a Davis-Bacon project. Id. Furthermore, the NLRB noted, only 2-3% of the union’s job targeting funds came from federal or state prevailing-wage jobs. Id. In sum, Can-Am I held the distribution of those funds actually protected under the NLRA, despite the fact that some small portion of them was apparently derived from Davis-Bacon wages.
The D.C. Circuit granted a petition for review of Can-Am and remanded the matter back to the NLRB. Can-Am II, 321 F.3d at 147. Can-Am had offered essentially the same argument urged by the Attorney General in this case, “contend[ing] that because the [NLRA] does not protect [job targeting programs] that offend public policy, and the Union’s [program] is contrary to both federal and state Davis-Bacon laws, Can-Am’s lawsuit is not preempted under Garmon.” Id. at 151. After examining at length the cases regarding the collection of funds on Davis-Bacon jobs, Canr-Am II held that “[t]he Board’s conclusory findings that these moneys did not taint the job targeting program are inadequate to support its determination that the operation of the program as a whole was protected conduct under section 7.” Id. at 147. The court noted, specifically, that the NLRB did not “explain why the Davis-Bacon moneys did not affect the [job targeting program’s] legality or why the Union’s conduct in that regard was excusable,” and went on to observe that “[n]o court or administrative decision of the Board has yet defined precisely how much Davis-Bacon money may flow into a [job targeting program] before the program violates public policy.” Id. at 153. Canr-Am II therefore remanded the matter for further consideration, noting that, after accepting additional evidence, “the Board on remand may yet determine *964 that the [job targeting program] is protected under section 7.” Id. at 154.
On remand, the NLRB determined that Can-Am had waived the remanded issue by not previously contending that the inclusion of monies derived from Davis-Bacon wages rendered the program unprotected. Can-Am Plumbing, Inc., 350 NLRB 947, 949 (2007) (“Can-Am III”). In the process, the Board provided an important gloss on its earlier decision:
Of course, [the Board’s prior discussion of the inclusion of a small amount of Davis-Bacon wages in the job targeting program at issue in that case] should not be interpreted to mean that the inclusion of contributions from wages earned on Davis-Bacon projects would be unlawful. The Board has not ruled on that question and it is not raised here.
Id. (emphasis added). The Board quite pointedly, then, left the issue presented in this case open.
The NLRB has not revisited the matter since the Can-Am Plumbing litigation. The closest it has come was J.A Croson Co., 2012 WL 5246914. Contrary to the Attorney General’s suggestion, that case did nothing to undermine the arguable protection of the conduct regulated by the Act, and indeed underscored it.[12]
Croson, a non-union contractor, sued J.A. Guy, Inc., a union contractor, in Ohio state court, alleging that Guy’s deduction of a job targeting assessment from its employees’ wages violated Ohio’s statutes and regulations requiring prevailing wages on public works projects, a type of law known as a “Little Davis-Bacon.” Id. at *2. The Ohio Supreme Court held the lawsuit preempted by the NLRA. J.A. Croson Co. v. J.A. Guy, Inc., 81 Ohio St.3d 346, 691 N.E.2d 655, 665 (1998). Guy then filed a charge with the NLRB, alleging that Croson’s maintenance of the suit was prohibited by § 8 because the job targeting program was protected by § 7. J.A. Croson Co., 2012 WL 5246914 at *4. The NLRB held that, despite a determination from the Ohio Department of Industrial Relations that Guy had violated the Little Davis-Bacon statute, the job targeting program was actually protected and so the suit was an unfair labor practice. Id. at *5, *6.
The Board took pains to emphasize that no federal Davis-Bacon issue was presented in J.A. Croson Co. See id. at *8; see also id. at *7 n. 20. But the Attorney General suggests that, by seizing on the federal-state distinction in J.A. Croson Co., the NLRB indicated that such programs are protected when only state wages are involved and are not protected when federal Davis-Bacon wages are used.
We do not read J.A. Croson Co. that way. In that case, as in Kingston Constructors, the underlying conduct was the collection of funds. See id. at *2, *7-8; see also id. at *18 n. 7 (Member Hayes, dissenting). And, as we have already explained, Kingston Constructors held, in *965 deference to the DOL and two circuit courts, that the collection of such funds from federal Davis-Bacon wages was inimical to public policy. It therefore makes sense that J.A. Croson Co. would distinguish between federal and state funds in determining whether the collection of monies for job targeting programs is protect-' ed. J.A. Croson Co. did not decide the question reserved in Carv-Am III, namely whether the distribution of those funds is protected.
Moreover, J.A. Croson Co. suggests that, if the issue were squarely presented, the NLRB might hold the payment of funds derived from Davis-Bacon wages actually protected under § 7. First, the NLRB notably took the “opportunity” afforded by J.A. Croson Co. to reiterate yet again that job targeting programs are generally protected by the NLRA, and gave its most full-throated defense to date of the protected nature of such programs in general. Id. at *6.
Second, J.A. Croson Co. emphasized the extent to which Kingston Constructors was, with regard to Davis-Bacon, based on deference to the DOL. See id. at *7.[13] We read J.A. Croson’s emphasis on the role of deference in Kingston Constructors as an indication that, were the issue in this case presented to the NLRB, it might well hold the distribution of job targeting funds, even if some were derived from Davis-Bacon wages, is protected as a form of employee concerted activity not in violation of any public policy firmly established by another statute.
In asserting Garmon preemption, the Trades Councils bear the burden “to demonstrate that [this issue] is one that the Board could legally decide in [their] favor.” Davis, 476 U.S. at 395, 106 S.Ct. 1904. This is not a demanding standard; the Trades Councils need not, for example, show that the Board will or is even likely to ultimately agree with their position. Rather, they need only “advance an interpretation of the [NLRA] that is not plainly contrary to its language and that has not been authoritatively rejected by the courts or the Board.” Id. (internal quotation marks omitted).
The Trades Councils have met this burden. The NLRB’s decisions in the Can-Am litigation, as well as its recent discussion in J.A. Croson Co., convince us that the Trades Councils’ interpretation of § 7, as protecting the distribution of funds contributed to job targeting programs when some of the contributions are traceable to wages employees earned on Davis-Bacon covered projects, is, at the very least, arguable.
*966 V.
The Attorney General and ABC contend that, even if the use of funds derived from Davis-Bacon wages is arguably protected, preemption is nonetheless inappropriate. Their arguments are mer-itless.
ABC argues that the Act escapes preemption because “there is a sufficiently deeply rooted state interest in proscribing the collection and use of employee monies to undermine free and fair competition,” as evidenced by Idaho’s expansive right-to-work legislation. Garmon’s exception for cases in which “the regulated conduct touche[s] interests ... deeply rooted in local feeling and responsibility,” 359 U.S. at 244, 79 S.Ct. 773, does not, however, extend to local interests in labor policy, except to the extent permitted by § 14(b). On the contrary, the NLRA “replaced” local labor policy with “an unequivocal national declaration of policy establishing the legitimacy of labor unionization and encouraging the practice of collective bargaining.” Sears, Roebuck & Co. v. San Diego Cnty. Dist. Council of Carpenters, 436 U.S. 180, 190, 98 S.Ct. 1745, 56 L.Ed.2d 209 (1978). No matter how deeply rooted in local feeling Idaho’s views on labor relations may be, they do not for that reason escape preemption.
Moreover, the notably federal nature of the state’s purported interest is also relevant with regard to ABC’s argument. A purported state interest in banning job targeting distributions because they include funds derived from Davis-Bacon wages earned on federally funded projects, is not a “significant state interest.” Id. at 196, 98 S.Ct. 1745 (emphasis added). Rather, as we have explained, such an interest would be purely federal, and therefore could not warrant an exception to otherwise-applicable Garmon preemption.
We likewise are unpersuaded by the Attorney General’s contention that the Trades Councils’ argument for § 7 protection as to programs which include funds derived from Davis-Bacon wages is weak, and that therefore, even if that protection is technically arguable, preemption is not warranted under Sears. Sears noted that “the acceptability of ‘arguable protection’ as a justification for pre-emption in a given class of cases is, at least in part, a function of the strength of the argument that § 7 does in fact protect the disputed conduct.” 436 U.S. at 203, 98 S.Ct. 1745.
Initially, as we have explained, based on the NLRB’s various decisions bearing on this case, the Trades Councils’ argument for § 7 protection has substance. It therefore does not trigger the Sears exception relied upon. Moreover, while, in arguing for a Sears exception, the Attorney General relies only on his assessment of the strength of the § 7 argument, we note that Sears was quite different from this case in several other respects. First, unlike Sears, which involved generally applicable trespass law, the Act is a “state law[ ] regulating the relations between employees, their union, and their employer,” a situation in which the Garmon reasoning “has its greatest force.” Id. at 193, 98 S.Ct. 1745; see also id. at 197 n. 27, 98 S.Ct. 1745. Second, as we have explained, unlike the cause of action in Sears, the Act as applied to funds derived from Davis-Bacon projects does not regulate any “significant state interest” “deeply rooted in local feeling and responsibility.” Id. at 195-96, 98 S.Ct. 1745 (quoting Garmon, 359 U.S. at 244, 79 S.Ct. 773) (internal quotation marks omitted). Third, unlike in Sears, it cannot be said that the Act would “entail[ ] little risk of inference with the regulatory jurisdiction” of the NLRB. Id. at 196, 98 S.Ct. 1745; see also id. at 201, 98 S.Ct. 1745. An Idaho court seeking to *967 apply the Act to a case involving funds derived from Davis-Bacon wages would have to answer the “identical” question reserved in Can-Am 111: Is such a program protected by § 7? Fourth, and finally, we see no reason to conclude that this case implicates the concerns presented in Sears that preemption would create a jurisdictional “no-man’s land.” Id. at 208, 98 S.Ct. 1745 (Blackmun, J., concurring). Can-Am III declined to address the § 7 argument at issue here only because the respondent had waived the issue. 350 N.L.R.B. at 949.
VI.
All of the conduct prohibited by the Act is either actually or arguably protected under § 7, and no exception to preemption applies. The Act is therefore facially preempted under Garmon.
The Trades Councils sought a declaration and permanent injunction, but the district court’s order did not explicitly refer to any particular relief, stating only that the Acts were preempted and so the Trades’ Councils’ motion for summary judgment was granted. Confusingly, the court’s judgment also stated that the case was “dismissed.” We remand for the district court to award appropriate relief and enter an appropriate judgment.
AFFIRMED IN PART, VACATED IN PART, AND REMANDED.

. The latter practice was initially popular, but “made the union responsible for fringe benefits, workers' compensation, and' other supplements associated with wages and benefits, plus ‘an enormous amount of paperwork for the union, as it had to keep track of each hour worked by each member on a targeted job and then issue checks to each as the work proceeded.' " White, supra at 71 (quoting Jack Metzgar, “Buying the Job” Target Programs and the Elgin Plan, 1 Lab. Res. Rev. 51, 53 (1988)). “Now on targeted jobs, the common approach is for the union to make a grant directly to the contractor who wins the job.” Id.

. The Trades Councils also sought to enjoin another statute, the “Open Access to Work Act,” Idaho Code § 44-2013. In the memorandum disposition filed concurrently with this opinion, we hold that the unions did not establish standing to challenge § 44-2013, vacate the district court's grant of summary judgment as to § 44-2013, and remand with instructions to dismiss the portion of the Trades Councils' complaint challenging § 44-2013.

. ABC also timely appealed the court’s denial of its motion to intervene, and the two appeals were consolidated. In the memorandum disposition filed concurrently with this opinion, we affirm the district court's decision on the intervention issue.

. The other major NLRA preemption theory is “known as Machinists pre-emption” and "forbids both the ... NLRB and States to regulate conduct that Congress intended 'be unregulated because left to be controlled by the free play of economic forces.’ ” Brown, 554 U.S. at 65, 128 S.Ct. 2408 (quoting Lodge 76, Int'l Ass’n of Machinists v. Wisc. Emp’t Relations Comm'n, 427 U.S. 132, 140, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976)) (some internal ' quotation marks omitted).

. Section 7 of the NLRA provides, in relevant part, that "[e]mployees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection.” 29 U.S.C. § 157. Section 8 defines as a prohibited "unfair labor practice,” inter alia, an employer’s actions "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title.” 29 U.S.C. § 158(a)(1).

. Davis-Bacon was previously codified at 40 U.S.C. § 276a et seq.

. See Sprint Telephony PCS, L.P. v. Cnty. of San Diego, 543 F.3d 571, 579 & n. 3 (9th Cir.2008) (en banc); but see United States v. Arizona, 641 F.3d 339, 345 n. 3 (9th Cir.2011), aff'd in part, rev’d in part, - U.S. -, 132 S.Ct. 2492, 183 L.Ed.2d 351 (2012); see also City of Los Angeles v. Patel,-U.S. -, 135 S.Ct. 2443, 2451, 192 L.Ed.2d 435 (2015).

. The regulations also allow certain deductions with the permission of the Secretary of Labor. 29 C.F.R. § 3.6.

. Building Trades was decided by the Wage Appeal Board, which DOL replaced with the Administrative Review Board in 1996. Establishment of the Administrative Review Board, 61 Fed.Reg. 19982-01, 19982 (May 3, 1996). Under current regulations, the Secretary of Labor has delegated to the Administrative Review Board the authority “to hear and decide in its discretion appeals concerning questions of law and fact” regarding, among other things, "[w]age determinations issued under the Davis-Bacon Act.” 29 C.F.R. § 7.1(b). We refer to both boards, and the department itself, as "DOL.”

. In cases, unlike this one, involving the potential application of the Act to specific factual situations, the party asserting preemption "must then put forth enough evidence to enable the court to find that the Board reasonably could uphold a claim based on such an interpretation.” Davis, 476 U.S. at 395, 106 S.Ct. 1904.

. The Supreme Court has observed that the NLRB must, at times, accommodate federal statutes beyond the NLRA. "Frequently the entire scope of Congressional purpose calls for careful accommodation of one statutory scheme to another, and it is not too much to demand of an administrative body that it undertake this accommodation without excessive emphasis upon its immediate task.” S. S.S. Co. v. NLRB, 316 U.S. 31, 47, 62 S.Ct. 886, 86 L.Ed. 1246 (1942); see also Hoffman Plastic Compounds, Inc. v. NLRB, 535 U.S. 137, 142-44, 122 S.Ct. 1275, 152 L.Ed.2d 271 (2002).

. The Supreme Court has held that two of the four Board members who decided J.A. Croson Co., Members Griffin and Block, were not validly appointed by the President. NLRB v. Noel Canning, - U.S. -, 134 S.Ct. 2550, 2557, 2578, 189 L.Ed.2d 538 (2014). Although J.A. Croson Co. was extensively discussed in the parties’ briefing, no party in this case has raised the precedential viability of J.A. Croson Co. in light of Noel Canning. In any event, the principal significance of J.A. Croson Co. to this case is the light it sheds on whether the conduct proscribed by the Act is arguably protected. Whether J.A. Croson Co. remains good law, or is only a non-authoritative statement from two Board members and two putative Board members, does not much matter for the purposes of deciding whether distribution of job targeting funds derived in part from Davis-Bacon wages — a matter that, as we shall explain, was not at issue in J.A. Croson Co. — is arguably protected. With this caveat, we refer to the decision in J.A. Croson Co. as the opinion'of the NLRB.

. It is doubtful that the DOL would have the authority directly to regulate the distribution of funds derived from Davis-Bacon wages to contractors not working on Davis-Bacon jobs. Cf. Reich, 40 F.3d at 1288 (Edwards, C.J., dissenting) (noting that "[e]ven the Labor Department’s Wage and Hour Administrator admits that wage deductions on [non-Davis-Bacon] projects are beyond the scope of the Department’s authority”). Neither the Davis-Bacon Act nor the associated regulations mention such distribution. Cf. Building Trades, 1991 WL 494718 at *5-6. Some of the opinions we have discussed include broad language which can be read to suggest that distribution of funds derived from Davis-Bacon wages to non-Davis-Bacon contractors might be a violation of the Davis-Bacon Act. See Brock, 68 F.3d at 1201; Reich, 40 F.3d at 1280; Building Trades, 1991 WL 494718, at *6. As noted, however, the distribution of funds was not the issue in any of those cases. Furthermore, insofar as such broad statements indicate concern about the potential job targeting programs have for warping future prevailing wage determinations, we note that the method by which the DOL determines the prevailing wage is not prescribed in the Davis-Bacon Act. Nothing in Davis-Bacon precludes DOL from requiring disclosure of data on job targeting spending, to ensure that future prevailing wage determinations are accurate.