# In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 04-3689

OFFICE & PROFESSIONAL EMPLOYEES
INTERNATIONAL UNION, LOCAL 95,

*Plaintiff-Appellant*,

v.

WOOD COUNTY TELEPHONE COMPANY,

*Defendant-Appellee*.

_____

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 04-C-383-S—**John C. Shabaz**, *Judge*.

_____

ARGUED APRIL 13, 2005—DECIDED MAY 10, 2005

_____

Before EASTERBROOK, KANNE, and SYKES, *Circuit Judges*.

EASTERBROOK, *Circuit Judge*. An evergreen clause in the collective bargaining agreement between Wood County Telephone Company and one of its unions provided that the CBA "shall automatically continue in full force and effect after [its original expiration date] until terminated by sixty (60) day written notice given by either party". The expiration date was July 5, 2003. By a letter dated May 1, 2003, the Union notified the Employer of its "desire to reopen this

Agreement and to negotiate on wages, hours and conditions of employment for a successor agreement." Negotiations lasted for a year, and on May 4, 2004, the parties ratified a new agreement.

This litigation arises from events in March 2004, when the Employer fired one member of the bargaining unit and disciplined another. The Union filed grievances, which were handled under the terms of the old agreement. When the grievances could not be resolved to mutual satisfaction, the Union proposed to arbitrate; the Employer refused, asserting that the old agreement (which like the new one contained an arbitration clause) had expired on July 5, 2003. This surprised the Union, for until then both sides had acted as if the old agreement remained in force: the Employer paid the wages and fringe benefits provided by the old agreement, deducted union dues under the old agreement's union-security clause, paid union stewards for the time they devoted to adjusting grievances, and so on. A dues checkoff is lawful only when expressly authorized in writing. 29 U.S.C. §158(a)(3), §186(c)(4). We have treated a continuing dues checkoff as an employer's acknowledgement that a collective bargaining agreement remains in force. See *United States Can Co. v. NLRB*, 984 F.2d 864, 869-70 (7th Cir. 1993). The Union filed this suit seeking an order that would require the Employer to arbitrate. Without discussing the significance of the dues checkoff, the district court granted summary judgment to the Employer, stating that a proposal to reopen an agreement is the same thing as a notice to terminate that agreement.

"Reopen" and "terminate" are different ideas as well as different words. Preserving that difference enables parties to negotiate a new bargain while the old one remains in force. Allowing an agreement to persist is the point of an evergreen clause (which is to say, an automatic rollover clause). The parties' old agreement had a no-strike, no-lockout clause. Keeping that CBA in force while the parties negotiate for a

replacement reduces the risk of labor strife and lost productivity. If the Employer thought that this would afford the Union too cushy a position—for while the old agreement lasted labor could hold out for better terms without a risk that the employer would demand givebacks—it had only to give its own notice of termination. What we cannot see is any reason why this evergreen clause should be read to *prevent* dickering while the old terms continue. Yet that is the upshot of the district court's approach: even if neither side wants the old agreement to end, it does so automatically whenever negotiations for a replacement begin.

Using the word "reopen" instead of "negotiate" does not convey a desire to end the current deal *now*, as opposed to later when the bargaining has been concluded. Some CBAs allow mid-term renegotiation at either side's request; such a provision is called a "reopener." For example, if such a CBA had a four-year term, with a reopener that could be exercised at the end of two years, then either side would be obliged to bargain on the other's demand—but the exercise of this privilege would not bring the whole agreement to an end after two years. See *NLRB v. Cook County School Bus, Inc.*, 283 F.3d 888, 894 (7th Cir. 2002); *Air Line Pilots Association v. UAL Corp.*, 897 F.2d 1394, 1396 (7th Cir. 1990). Terms and conditions of employment in years three and four of the agreement would remain as provided, unless the parties agreed to a change. Just so here, when the Union wanted to reopen at the time the agreement specified an automatic extension. Unless one side gave notice of termination, they could engage in negotiation, with the new terms to replace the old only when a new understanding had been reached.

If there were doubt about whether the Union had used the word "reopen" to mean "terminate," then the district judge might have turned to parol evidence. (The letter's quotation from §2001 of the old contract, which contained the termination clause, might have been a ground to treat

the letter as ambiguous.) But there is no need for a trial on that score, because all of the extrinsic evidence points one way. The author of the Union's letter of May 1, 2003, testified by affidavit that he deliberately avoided the word "terminate" when setting new collective bargaining in motion, so that the old agreement would persist during the negotiations.

When granting summary judgment for the Employer, the district court relied principally on *Baker v. Fleet Maintenance, Inc.*, 409 F.2d 551 (7th Cir. 1969), and *Oil, Chemical & Atomic Workers Union v. American Maize Products Co.*, 492 F.2d 409 (7th Cir. 1974), which it read to establish a rule that any notice sufficient to initiate collective bargaining also terminates the old contract. It is hard to see why the reading of other clauses that contained other language should establish a rule of law that supersedes what *these* parties set out to achieve with *their* chosen language. Neither *Fleet Maintenance* nor *American Maize* purports to establish such a rule; each treats the question at hand as the best way to understand a particular contract. Thus *American Maize* holds that a demand to negotiate new terms, under a clause that ends the agreement 60 days after "notice is given by either party that it desires to *amend or terminate* this Agreement", had the same effect as a notice of termination. 492 F.2d at 410 (emphasis added). The agreement in our case, by contrast, does not equate notice of desire to amend with notice of desire to terminate. (The contract in *American Maize* added that a proposal to amend *specified* terms would not produce termination; we thought it significant that the union's notice referred to all terms rather than particular sections, a step that would have kept the remainder in force. *Id.* at 411-12.)

*Fleet Maintenance* dealt with an evergreen clause more like the one in our parties' contract. It said that the agreement continues "unless written notice of desire to cancel or terminate the Agreement is served by either party upon the

other at least sixty (60) days prior to date of expiration." 409 F.2d at 553. The union sent an ambiguous letter, notifying Fleet Maintenance of a desire to negotiate a "new contract wage agreement commencing April 1, 1967, modifying the current contract wage agreement . . . which terminates March 31, 1967." *Ibid*. The notice was ambiguous because it used the magic word "terminate" (implying that the expiration date would not roll forward) but could have been read to emphasize the word "modify" instead. The only proffered extrinsic evidence was to the effect that Fleet Maintenance deemed this letter a termination; the union did not offer a contrary (contemporaneous) view. The letter sent to Wood County Telephone lacks a comparable ambiguity: it uses the word "reopen" but does not say or imply that this sets a terminal date for the old agreement. And, as we have mentioned, all parol evidence favors the no-termination view here (just as parol evidence favored a termination understanding in *Fleet Maintenance*).

Let us come back to the Employer's conduct. It has not attempted to show any detrimental reliance on a belief that the agreement ended on July 5, 2003. How could it, after it had followed the old agreement to the letter, just as if it remained in force, until rebuffing the Union's demand for arbitration? One provision that the Employer implemented was the union-security clause, under which it deducted the workers' union dues from their pay and remitted this money to the Union. That is lawful *only* when authorized by express writings, 29 U.S.C. §158(a)(3), §186(c)(4), so the agreement must have continued during the negotiations. The Employer contests this inference, relying on *Joint Executive Board of Las Vegas v. NLRB*, 309 F.3d 578 (9th Cir. 2002), which holds that the rule of labor law freezing the terms and conditions of employment until the parties negotiate to impasse—after which the employer may implement its current offer, see *NLRB v. Katz*, 369 U.S. 736 (1962)—applies to dues checkoffs as well as wages and fringe benefits.

*Joint Executive Board of Las Vegas* does not persuade us to abandon our decision in *United States Can*. The ninth circuit recognized that it was going against a position long followed by the National Labor Relations Board—a position that we discussed and applied in *United States Can*— but said that it just could not understand the basis of the Board's distinction between dues checkoffs and other terms and conditions of employment. Why must the checkoff cease while all other terms and conditions must continue? We have no similar problem understanding the basis of the Board's rule. It is §158(a)(3), which distinguishes between checkoffs and other terms, subjecting checkoffs alone to an express-contractual-authorization requirement. The idea behind this statute is that wages are the employees' money, which may be handed over to a third party such as a union only with the employees' consent. If the contract expired on July 5, 2003, the consent expired with it unless the employees gave or reiterated their permission individually. The Labor Board has concluded that the required written consent may be personal as well as collective, and that personal consent may survive the expiration of a CBA. See *Lowell Corrugated Container Corp.*, 177 N.L.R.B. 169, 172-73 (1969); *Wilkes Telephone Membership Corp.*, 331 N.L.R.B. 823, 830 & n.16 (2000). But the Employer does not contend that members of the bargaining unit gave their consent personally, as opposed to through the CBA. So to maintain the checkoff is to assert that the CBA itself remained in force.

If the doctrine requiring employers to afford workers all terms of the *status quo* until a new contract (or an impasse) has been reached were one that extended the length of the contract, then §158(a)(3) and §186(c)(4) would not come into play. But this is not how the unilateral-change doctrine of labor law works. If it did, then *all* terms of a contract would carry forward—and, in particular, the arbitration clause of the old agreement would itself continue to govern in March

2004. But it does not; the Supreme Court held in *Litton Financial Printing Division of Litton Business Systems, Inc. v. NLRB*, 501 U.S. 190 (1991), that the only terms that continue are those that the employer may implement on its own. Because arbitration requires agreement, the obligation to arbitrate expires with a collective bargaining agreement. The Court explained that the terms that the employer must honor under the unilateral-change doctrine "are no longer agreed-on terms; they are terms imposed by law, at least so far as there is no unilateral right to change them. . . . [T]he obligation not to make unilateral changes is 'rooted not in the contract but in preservation of existing terms and conditions of employment and applies before any contract has been negotiated.'" 501 U.S. at 206-07 (citation omitted). See also *Laborers Health & Welfare Trust v. Advanced Lightweight Concrete Co.*, 484 U.S. 539 (1988); *McNealy v. Caterpillar, Inc.*, 139 F.3d 1113, 1119-20 (7th Cir. 1998).

Although an employer must keep in force all terms and conditions that are within its unilateral power, "other contractual obligations will cease, in the ordinary course, upon termination of the bargaining agreement." *Litton*, 501 U.S. at 207. But for *Litton* the Employer would have lost this suit on the pleadings, because the unilateral-change doctrine would have kept in force its promise to arbitrate. To avoid arbitration the Employer must rely on *Litton* and in doing so must take the bitter with the sweet. The rationale of *Litton* applies to checkoffs, for a dues checkoff no less than arbitration requires the employees' assent through a binding contract. By continuing to remit dues to the Union, the Employer manifested a belief that it *had* such assent—in other words, that the agreement had not been terminated in July 2003. Whatever ambiguity may lurk in the Union's May 1, 2003, letter has been dispelled by ratification of the agreement's continuation: the employer ratified it by adhering to all of its terms, and the Union did likewise (not to mention the Union's insistence in this litigation that the

agreement survived until its replacement in May 2004). Consequently the grievance-resolution machinery applicable in March 2004 included the Employer's promise to arbitrate.

The judgment is reversed, and the case is remanded with instructions to enter a judgment requiring the Employer to arbitrate these grievances.

A true Copy:

      Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*