Hamilton, Circuit Judge.
Wisconsin's Act 1 of 2015, codified at Wis. Stat. § 111.01 et seq., changed many provisions of that State's labor laws. This case deals with a narrow provision of Act 1 that attempts to change the rules for payroll deductions that allow employees to pay union dues through dues-checkoff authorizations.
A dues-checkoff authorization is a contract between an employer and employee for payroll deductions. These are "arrangements whereby [employers] would check off from employee wages amounts owed to a labor organization for dues, initiation fees and assessments." Felter v. Southern Pacific Co. , 359 U.S. 326, 330-31, 79 S.Ct. 847, 3 L.Ed.2d 854 (1959). By signing an authorization, the employee directs the employer to deduct union dues or fees routinely from the employee's paycheck and to remit those funds to the applicable union. Many of these authorizations are irrevocable for a specified period-often one year-for reasons of administrative simplicity. See Dkt. 43 at 2 (Elizondo Aff.); see also N.L.R.B. v. Atlanta Printing Specialties and Paper Prods. Union 527 , 523 F.2d 783, 786 (5th Cir. 1975). The union itself is not a party to the authorization, which is effective if and only if the employee wishes. Federal law has long provided, however, that unions can bargain collectively with employers over the standard terms of dues-checkoff authorizations.
The Taft-Hartley Act imposes three limits on dues-checkoff authorizations: the authorization must be (1) individual for each employee, (2) in writing, and (3) irrevocable *493 for no longer than one year. See 29 U.S.C. § 186(a)(2), (c)(4). Wisconsin's Act 1 attempts to shorten this maximum period to thirty days. See 2015 Wis. Act 1, § 9, codified at Wis. Stat. § 111.06(1)(i).
The district court found that Wisconsin's attempt to impose its own time limit on dues-checkoff authorizations is preempted by federal labor law, and the court issued a permanent injunction barring enforcement of that provision. International Ass'n of Machinists District 10 v. Allen , No. 16-cv-77, 2016 WL 7475720, at *7 (W.D. Wis. Dec. 28, 2016). We affirm. This case is controlled by the Supreme Court's summary affirmance in a case finding a nearly identical State law preempted. Sea Pak v. Indus., Tech. & Prof. Employees, Div. of Nat'l Maritime Union , 400 U.S. 985, 91 S.Ct. 452, 27 L.Ed.2d 434 (1971) (mem.). We reject Wisconsin's effort to undermine the precedential force of Sea Pak , which is fully consistent with more general federal labor law preemption principles. See, e.g., Machinists v. Wisconsin Employment Relations Comm'n , 427 U.S. 132, 140-42, 153, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976). Wisconsin's attempt to short-circuit the collective bargaining process and to impose a different dues-checkoff standard is preempted by federal law.
I. Factual and Procedural History
A. Wisconsin Act 1
Before Act 1 was enacted in 2015, Wisconsin law had allowed so-called union security agreements in which unions and employers would agree that employees would be required either to join the union or pay fair-share fees. That changed with Act 1's "right-to-work" provisions, which prohibit employers from requiring their employees to pay dues or fees to a union. See International Union of Operating Engineers Local 139 v. Schimel , 863 F.3d 674, 676-77 (7th Cir. 2017), excerpting 2015 Wis. Act 1, § 5, codified at Wis. Stat. § 111.04(3)(a). Act 1 provides in part: "No person may require, as a condition of obtaining or continuing employment, an individual to ... Pay any dues, fees, assessments, or other charges ... to a labor organization." § 111.04(3)(a)(3). This also meant that Wisconsin employers and unions could no longer enter into an enforceable mandatory union security agreement-a term in a collective bargaining agreement where an employer promises the union that, as a condition of employment, it will require its employees to maintain membership in the union. We held in Schimel that this "right-to-work"/mandatory union security agreement portion of Act 1 is not preempted by federal law. 863 F.3d at 677.[1]
The section of Act 1 challenged in this lawsuit attempts a less dramatic change in labor law. It requires employers to terminate dues-checkoff authorizations within thirty days of receiving written notice from the employee. 2015 Wis. Act 1, § 9, codified at Wis. Stat. § 111.06(1)(i). This challenged provision reads:
(1) It shall be an unfair labor practice for an employer individually or in concert with others: ...
(i) To deduct labor organization dues or assessments from an employee's earnings, unless the employer has been presented with an individual order therefor, signed by the employee personally, and terminable by the employee giving to the employer at least 30 days' written notice of the termination. This paragraph applies to the extent permitted under federal law.
*494 B. The Dispute at the John Deere Plant
This case stems from a complaint filed with the Wisconsin Department of Workforce Development, the State agency that enforces Wisconsin's wage laws. Lisa Aplin, an assembler at a John Deere plant in Wisconsin, signed a dues-checkoff authorization in November 2002. Her authorization instructed John Deere to deduct union dues from her paychecks and to remit them to the International Association of Machinists District 10 and Local Lodge 873, the plaintiffs-appellees here, which we refer to as the Machinists or the union. Aplin's authorization said that it was "irrevocable for one (1) year or until the termination of the collective bargaining agreement ... whichever occurs sooner." It also provided that it would be automatically renewed for successive one-year periods unless the collective bargaining agreement terminated or Aplin gave notice during a fifteen-day annual period. The authorization also provided that it was "independent of, and not a quid pro quo for, union membership." This arrangement remained in effect until 2015. As the State explains, dues-checkoff authorizations like this are a convenient way for employees to pay their union dues or fair-share fees.
In the wake of Act 1, John Deere and the Machinists updated their collective bargaining agreement, but they left in place a term making dues-checkoff authorizations irrevocable for one year. In July 2015, Aplin sent a letter to John Deere and the union invoking Act 1 and requesting the termination of her dues-checkoff authorization. The union responded that her request was untimely and could not be granted unless she renewed it during the annual cancellation period that November.
Aplin then filed a complaint with the State agency claiming that John Deere was violating State wage laws by not honoring within thirty days her attempt to revoke the dues-checkoff authorization. She sought a refund of $65.60 in union dues deducted from her pay after the cancellation would have taken effect. In November 2015, the agency sided with Aplin, finding that Wis. Stat. § 111.06(1)(i) applied and that John Deere had to honor Aplin's cancellation and refund request, or face enforcement action. The company then reimbursed Aplin for the $65.60 deducted from her paycheck. Around the same time, the agency handled another similar dues-checkoff complaint invoking Wis. Stat. § 111.06(1)(i) and concluded that it "must enforce the statute in its current form" unless and until it was found preempted.
C. This Federal Lawsuit
In February 2016, the Machinists filed this action in the Western District of Wisconsin and moved to enjoin the State from enforcing Act 1's dues-checkoff provision. The union contended that the federal Labor-Management Relations Act of 1947, better known as the Taft-Hartley Act, preempted Act 1 on this score. See Pub. L. No. 80-101, § 302(a), (c)(4), 61 Stat. 157, codified at 29 U.S.C. § 186(a), (c)(4).
To protect against corruption in the collective bargaining process, the Taft-Hartley Act, as amended, prohibits "any employer or association of employers" from giving "any money or other thing of value" to "any labor organization," § 186(a)(2), unless one of a long list of exceptions applies. § 186(c). The exception relevant here provides:
The [prohibition] provisions of this section shall not be applicable ...
(4) with respect to money deducted from the wages of employees in payment of membership dues in a labor organization: Provided , That the employer has received from each employee, on whose account *495 such deductions are made, a written assignment which shall not be irrevocable for a period of more than one year, or beyond the termination date of the applicable collective agreement, whichever occurs sooner....
§ 186(c)(4). The union argued that this year-long dues-checkoff exception in federal labor law is incompatible with, and thus preempts, the corresponding thirty-day provision of Wisconsin's Act 1.
The district court granted the union's motion for summary judgment and permanently enjoined enforcement of Wis. Stat. § 111.06(1)(i). 2016 WL 7475720, at *7-8. The district court found that this issue was "relatively straightforward, since its resolution is controlled by the United States Supreme Court's decision" in Sea Pak . Id . at *3, citing 400 U.S. 985, 91 S.Ct. 452, 27 L.Ed.2d 434 (1971).
II. Analysis
We review the legal conclusions of summary judgment rulings de novo , construing all facts and drawing all reasonable inferences in favor of the non-moving parties. See Wisconsin Central Ltd. v. Shannon , 539 F.3d 751, 756 (7th Cir. 2008). Here, however, because there are no genuine issues of material fact, we must decide only whether the union is entitled to a judgment as a matter of law. Id. ; Fed. R. Civ. P. 56(c). The main issue in this appeal is whether Wis. Stat. § 111.06(1)(i) is preempted by Taft-Hartley's § 302(c)(4), codified at 29 U.S.C. § 186(c)(4). We also must address whether Taft-Hartley's § 14(b) exception to preemption for State "right-to-work" laws-codified at 29 U.S.C. § 164(b) -allows Wisconsin to do what it attempted to do here.
We conclude that the Taft-Hartley Act preempts Wisconsin's attempt to set new rules for dues-checkoff authorizations governed by § 186(c)(4). Because the challenged portion of Act 1 regulates an employee's optional dues-checkoff authorization rather than an employee's obligation to pay dues as a condition of employment, it falls outside the scope of the § 164(b)"right-to-work"/union security agreement exception. We explain in Part II-A that we agree with the district court that the Supreme Court's summary affirmance in Sea Pak controls this case. In Part II-B, we explain why Sea Pak fits comfortably with broader preemption principles of labor law. In Part II-C, we address and reject further arguments by the State for recognizing an exception from those principles here.
A. Sea Pak's Continuing Force
The procedural history of the Sea Pak decision was a bit unusual, but the district court correctly found that the Supreme Court's summary affirmance in Sea Pak controls here. The Supreme Court has instructed that "the lower [federal] courts are bound by summary decisions by this Court 'until such time as the Court informs (them) that (they) are not,' " because "votes to affirm summarily ... are votes on the merits of a case," just like those accompanied by fully reasoned Court opinions. Hicks v. Miranda , 422 U.S. 332, 344-45, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975) (brackets and citation omitted).
To understand the effect of a summary affirmance, it is usually necessary to look closely at the decision that was summarily affirmed. In Sea Pak , the Southern District of Georgia found a Georgia law very similar to Act 1 preempted. A Georgia law required employers to treat dues-checkoff authorizations as revocable at will. The district court found that provision was "completely at odds" and "in direct conflict" with 29 U.S.C. § 186(c)(4), which, as noted, permits dues-checkoffs to be irrevocable for up to one year.
*496 300 F.Supp. 1197, 1200 (S.D. Ga. 1969).[2] "A union is thus permitted to bargain for and receive a checkoff of dues under authorizations which may be irrevocable for as long as one year." Id. This Taft-Hartley provision meant "that no room remains for state regulation in the same field." Id.[3]
The district court in Sea Pak also noted that Judge Noland of the Southern District of Indiana had reached the same conclusion on the same preemption question, holding that § 186(c)(4) preempted an Indiana wage assignment law requiring assignments to be revocable at will. Id. at 1198-99, citing International B'hood of Operative Potters v. Tell City Chair Co. , 295 F.Supp. 961, 965 (S.D. Ind. 1968) ( § 186"specifies the conditions necessary for a valid check-off, and ... is sufficiently pervasive and encompassing" to preempt State wage assignment laws).
The Sea Pak district court also had to decide whether the Taft-Hartley provision in 29 U.S.C. § 164(b), which permitted States to outlaw "agreements requiring union membership as a condition of employment," also allowed a State to enact check-off provisions contrary to what is provided in § 186(c)(4). 300 F.Supp. at 1199-1200. The court found that the State's dues-checkoff regulation was not saved by § 164(b) : "Checkoff authorizations irrevocable for one year after [their authorization] date do not amount to compulsory unionism as to employees who wish to withdraw from membership prior to that time." Id. at 1201.
The Fifth Circuit affirmed per curiam , adopting the district court's opinion. 423 F.2d 1229, 1230 (5th Cir. 1970). The Supreme Court affirmed that decision summarily, without opinion. 400 U.S. 985, 91 S.Ct. 452, 27 L.Ed.2d 434 (1971). Both preemption arguments advanced in this case were "presented and necessarily decided" by the Court's summary affirmance in Sea Pak ; they did not "merely lurk in the record." See Illinois State Bd. of Elections v. Socialist Workers Party , 440 U.S. 173, 182-83, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979) (precedential effect of summary affirmance extends only to "the precise issues presented and necessarily decided," not to questions that "merely lurk in the record"). Sea Pak controls this case.[4]
*497 The State argues, though, that even if Sea Pak applies, subsequent developments in the Supreme Court's case law on preemption mean that Sea Pak is no longer binding. Language in Hicks v. Miranda may offer a small opening for lower courts to depart from summary decisions "when doctrinal developments indicate otherwise." 422 U.S. at 344, 95 S.Ct. 2281, quoting Port Authority Bondholders Protective Comm. v. Port of New York Auth ., 387 F.2d 259, 263 n.3 (2d Cir. 1967) (addressing dismissals for lack of substantial federal questions), and citing Doe v. Hodgson , 478 F.2d 537, 539 (2d Cir. 1973) (lower courts should follow summary decisions until Supreme Court says otherwise). We found such an opening in Baskin v. Bogan , 766 F.3d 648, 659 (7th Cir. 2014), finding that a 1972 summary dismissal for want of a substantial federal question rejecting a constitutional claim for same-sex marriage was no longer binding in light of a consistent series of more recent Supreme Court decisions recognizing certain sexual orientation rights under the Constitution. To the extent there might be any theoretical room for departing from the summary affirmance in Sea Pak , it would take much stronger signals from the Court to do so. As we explain in Part II-B, there has been no comparable sea-change in labor-law preemption or preemption more generally that would justify a lower court in departing from Sea Pak .
In addition, to agree with the State and reverse here, we would have to split with two other circuits. See United Auto., Aerospace & Agric. Implement Workers of Am. Local 3047 v. Hardin County , 842 F.3d 407, 410, 421-22 (6th Cir. 2016) (following Sea Pak to invalidate county ordinance regulating dues-checkoff authorizations); N.L.R.B. v. Shen-Mar Food Products, Inc. , 557 F.2d 396, 399 (4th Cir. 1977) (agreeing with NLRB that "the check-off provision was not a Union security device which would be subject to State law under Section 14(b)" of Taft-Hartley); see also N.L.R.B. v. Atlanta Printing Specialties and Paper Products Union 527 , 523 F.2d 783, 784, 787-88 (5th Cir. 1975) (enforcing NLRB order to employer and union to honor dues-checkoff cancellations tendered during annual escape period of fifteen days). We agree with the Sixth Circuit that Sea Pak 's "authority remains essentially unchallenged" today. Hardin County , 842 F.3d at 421.
B. Labor Law Preemption More Generally
1. Machinists and Garmon Preemption
The State urges us to decide this case under more general field- or conflict-preemption principles. We conclude, however, that Sea Pak is consistent with the Court's other labor law preemption decisions, which provide quite clear guidance here. In Murphy v. National Collegiate Athletic Ass'n , --- U.S. ----, 138 S.Ct. 1461, 1480, 200 L.Ed.2d 854 (2018), the Supreme Court explained that all forms of federal preemption "work in the same way: Congress enacts a law that imposes restrictions or confers rights on private actors; a state law confers rights or imposes restrictions that conflict with the federal *498 law; and therefore the federal law takes precedence and the state law is preempted." Most relevant for this case, "field preemption" occurs "when federal law occupies a 'field' of regulation 'so comprehensively that it has left no room for supplementary state legislation.' " Id ., quoting R.J. Reynolds Tobacco Co. v. Durham County , 479 U.S. 130, 140, 107 S.Ct. 499, 93 L.Ed.2d 449 (1986). Federal statutes that preempt a field "reflect[ ] a congressional decision to foreclose any state regulation in the area, even if it is parallel to federal standards." Murphy , 138 S.Ct. at 1481, quoting Arizona v. United States , 567 U.S. 387, 401, 132 S.Ct. 2492, 183 L.Ed.2d 351 (2012).
Over the decades since enactment of the National Labor Relations Act and the Taft-Hartley Act, the Supreme Court has applied field preemption in a host of cases interpreting those laws. The resulting body of law reflects many individual applications of the general principles of preemption, and labor-law preemption cases specifically provide the most reliable guidance for us in this case, if any were needed beyond the Court's summary affirmance in Sea Pak .
Labor law preemption applies, to put it broadly, when a State acts "as regulator of private conduct" with an "interest in setting policy" that is different from the policy of the federal government. Building & Constr. Trades Council v. Associated Builders & Contractors of Mass./R. I., Inc. , 507 U.S. 218, 229, 113 S.Ct. 1190, 122 L.Ed.2d 565 (1993) ( Boston Harbor ). Most relevant here are two forms of field preemption in labor law, known as Garmon preemption and Machinists preemption. The Supreme Court has explained:
The first, known as Garmon pre-emption, see San Diego Building Trades Council v. Garmon , 359 U.S. 236 [79 S.Ct. 773, 3 L.Ed.2d 775] (1959), "is intended to preclude state interference with the National Labor Relations Board's interpretation and active enforcement of the 'integrated scheme of regulation' established by the [National Labor Relations Act (or NLRA, also known as the Wagner Act) ]." Golden State Transit Corp. v. Los Angeles , 475 U.S. 608, 613 [106 S.Ct. 1395, 89 L.Ed.2d 616] (1986) ( Golden State I ). To this end, Garmon pre-emption forbids States to "regulate activity that the NLRA protects, prohibits, or arguably protects or prohibits." Wisconsin Dept. of Industry v. Gould Inc. , 475 U.S. 282, 286 [106 S.Ct. 1057, 89 L.Ed.2d 223] (1986). The second, known as Machinists pre-emption, forbids both the National Labor Relations Board (NLRB) and States to regulate conduct that Congress intended "be unregulated because left 'to be controlled by the free play of economic forces.' " Machinists v. Wisconsin Employment Relations Comm'n , 427 U.S. 132, 140 [96 S.Ct. 2548, 49 L.Ed.2d 396] (1976) (quoting NLRB v. Nash-Finch Co. , 404 U.S. 138, 144 [92 S.Ct. 373, 30 L.Ed.2d 328] (1971) ). Machinists pre-emption is based on the premise that " 'Congress struck a balance of protection, prohibition, and laissez-faire in respect to union organization, collective bargaining, and labor disputes.' " 427 U.S. at 140, n. 4 [96 S.Ct. 2548] (quoting [ Archibald] Cox, Labor Law Preemption Revisited, 85 Harv. L. Rev. 1337, 1352 (1972) ).
Chamber of Commerce v. Brown , 554 U.S. 60, 65, 128 S.Ct. 2408, 171 L.Ed.2d 264 (2008) ; see also 520 South Michigan Ave. Assoc. v. Shannon , 549 F.3d 1119, 1125-26 (7th Cir. 2008) (summarizing Garmon and Machinists preemption doctrines).
Both the Garmon and Machinists doctrines apply broadly to the Wagner (NLRA) and Taft-Hartley Acts: "the object *499 of labor pre-emption analysis," according to the Court, is "giving effect to Congress' intent in enacting" provisions of "the Wagner and Taft-Hartley Acts" as statements of national labor-management policy. Brown , 554 U.S. at 73, 128 S.Ct. 2408 ; see also Belknap, Inc. v. Hale , 463 U.S. 491, 524-25, 103 S.Ct. 3172, 77 L.Ed.2d 798 (1983) (referring to "the Wagner and Taft-Hartley Acts" as a cohesive whole), citing N.L.R.B. v. Insurance Agents , 361 U.S. 477, 489, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960) ; Machinists , 427 U.S. at 141, 96 S.Ct. 2548 (same).
Machinists preemption is quite broad. It recognizes that federal labor statutes "specifically conferred on employers and employees" a right to determine certain questions through bargaining and the use of other "permissible economic tactics," and to be free from government fiat in finding solutions. Golden State Transit Corp. v. City of Los Angeles , 493 U.S. 103, 112-13, 110 S.Ct. 444, 107 L.Ed.2d 420 (1989) ( Golden State II ) (where Machinists applies, it extends a right enforceable under 42 U.S.C. § 1983 ). Although "the rule of the Machinists case is not set forth in the specific text of an enumerated section of the NLRA," that statute's "language and structure" offer "a guarantee of freedom for private conduct that the State may not abridge." Id. at 111-12, 110 S.Ct. 444. Machinists instructs that both the NLRB and the States "are without authority to attempt to introduce some standard of properly balanced bargaining power" or to impose "an ideal or balanced state of collective bargaining" because Congress intended to leave such balancing to labor and management. Machinists , 427 U.S. at 149-50, 96 S.Ct. 2548 (quotations and citations omitted). "[T]he legislative purpose" as determined from the text and structure of the Wagner and Taft-Hartley Acts "may ... dictate that certain activity neither protected nor prohibited" by federal labor law may "be deemed privileged against state regulation." See id. at 141, 96 S.Ct. 2548, quoting Hanna Mining Co. v. Marine Engineers , 382 U.S. 181, 187, 86 S.Ct. 327, 15 L.Ed.2d 254 (1965).
For example, we applied Machinists preemption to an Illinois law that required cemeteries and gravediggers to negotiate to establish a pool of workers who would "perform religiously required interments during labor disputes." Cannon v. Edgar , 33 F.3d 880, 882, 885-86 (7th Cir. 1994). Despite the State law's benign purpose to respect certain faiths' beliefs concerning timely burial, the law impermissibly "meddle[d] with the collective bargaining process" by "directly interfer[ing] with the ability of" labor and management "to reach an agreement unfettered by the (labor) restrictions of state law." Id. at 886 ; see also id . at 885 (finding same statute preempted under Garmon as well). Similarly, we applied Machinists preemption to an Illinois law that required hotels to give custodial workers specified break periods, rather than leave the issue to collective bargaining. We found that the law was not a minimum labor standard but a specific intrusion into collective bargaining in a particular industry. 520 S. Michigan Ave. , 549 F.3d at 1121.
Even State laws with indirect effects on bargaining can be preempted under Machinists . Though Machinists itself was directed at a union's "refusal to work overtime" and the economic pressure that the refusal placed on the employer, see 427 U.S. at 154, 155, 96 S.Ct. 2548, it bars State regulation in any "zone protected and reserved for market freedom" by federal labor law. Boston Harbor , 507 U.S. at 226-27, 113 S.Ct. 1190 (city governments are "preempted from conditioning renewal of a taxicab operating license upon the settlement of a labor dispute"), citing *500 Golden State I , 475 U.S. at 618, 106 S.Ct. 1395. In such zones, the Court observed in Brown , "the States have no more authority than the Board to upset the balance that Congress has struck between labor and management." 554 U.S. at 74, 128 S.Ct. 2408 (brackets omitted), quoting Metropolitan Life Ins. Co. v. Massachusetts , 471 U.S. 724, 751, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985).
Before turning to more specific discussion of Garmon and Machinists preemption principles as applied to dues-checkoff authorization, we address the State's broadest argument, which is that the court should apply a much more demanding standard for preemption than was applied in Sea Pak , Garmon , or Machinists . The State cites and quotes Justice Kagan's concurring opinion in Kurns v. Railroad Friction Products Corp. , 565 U.S. 625, 638, 132 S.Ct. 1261, 182 L.Ed.2d 116 (2012), which observes that some older preemption cases may seem anachronisms in terms of newer preemption principles and precedents.
Kurns itself provides the best answer to the argument. Both the Kurns majority and Justice Kagan followed the arguably "anachronistic" decision in Napier v. Atlantic Coast Line Railroad Co ., 272 U.S. 605, 47 S.Ct. 207, 71 L.Ed. 432 (1926) (applying field preemption under Locomotive Inspection Act for railroad safety equipment). They did so because Napier had established the preemptive force of that statute decades earlier and Congress had not acted to change that law . 565 U.S. at 633, 132 S.Ct. 1261 (majority); id . at 638, 132 S.Ct. 1261 (Kagan, J., concurring). As in Kurns , the Supreme Court has often observed that principles of stare decisis take on "special force" on issues of statutory interpretation. They do so precisely because Congress can legislate to correct an erroneous decision by the Court. E.g., Global-Tech Appliances, Inc. v. SEB S.A. , 563 U.S. 754, 765, 131 S.Ct. 2060, 179 L.Ed.2d 1167 (2011) (patent law); Illinois Brick Co. v. Illinois , 431 U.S. 720, 736, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977) (antitrust law). A case that makes that point with special force, because Congress did respond with new legislation, is Patterson v. McLean Credit Union , 491 U.S. 164, 172-73, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989) (civil rights litigation), superseded by Civil Rights Act of 1991, as stated in CBOCS West, Inc. v. Humphries , 553 U.S. 442, 450, 128 S.Ct. 1951, 170 L.Ed.2d 864 (2008).
The State's reliance on more general principles of preemption from other statutory contexts thus fails to engage with the doctrinal heart of this case, which is the decades of decisions deciding the preemptive force of the Wagner and Taft-Hartley Acts. The issue before us is the preemptive scope of the Taft-Hartley Act, so the most relevant guides are the Supreme Court's decisions under that statute. Moreover, one cannot call Garmon and Machinists "anachronisms" when the Court has been citing and following them on a regular basis. See, e.g., Brown , 554 U.S. at 66, 128 S.Ct. 2408 (2008 decision discussing both and applying Machinists preemption); Marquez v. Screen Actors Guild, Inc ., 525 U.S. 33, 49, 119 S.Ct. 292, 142 L.Ed.2d 242 (1998) (applying Garmon preemption); Golden State I , 475 U.S. at 615-16, 106 S.Ct. 1395 (1986 decision applying Machinists preemption).
2. Preemption for Dues-Checkoff Rules
Returning to the text of the relevant Taft-Hartley provision, 29 U.S.C. § 186(c)(4), federal labor law imposes only minimal rules for collective bargaining on dues-checkoff authorization. Federal law leaves other details for resolution by private actors-employers, unions, and employees-through *501 the collective bargaining and dues-checkoff authorization processes.
Section 186 was enacted after Congress had gained some experience with how the Wagner Act worked in practice. The provision was intended "to deal with problems peculiar to collective bargaining" and in particular "was aimed at practices which Congress considered inimical to the integrity of the collective bargaining process." Arroyo v. United States , 359 U.S. 419, 424-25, 79 S.Ct. 864, 3 L.Ed.2d 915 (1959) ; see also Unite Here Local 355 v. Mulhall , 571 U.S. 83, 84, 134 S.Ct. 594, --- L.Ed.2d ---- (2013) (Breyer, J., dissenting from denial of certiorari) (describing how § 186 operates to discourage corruption of bargaining process). The backers of § 186"were concerned with corruption of collective bargaining through bribery of employee representatives by employers" and with other related financial risks. Arroyo , 359 U.S. at 425-26, 79 S.Ct. 864. The Taft-Hartley Act thus made it unlawful for employers to deliver "any money or other thing of value ... to any labor organization." § 186(a), (a)(2).
Congress did not intend, however, to outlaw dues-checkoff agreements. They are not a special opportunity for corruption but a convenient way for employees to pay their union dues. So Congress included this exception to the anti-corruption provision:
The provisions of this section shall not be applicable ...
(4) with respect to money deducted from the wages of employees in payment of membership dues in a labor organization: Provided , That the employer has received from each employee, on whose account such deductions are made, a written assignment which shall not be irrevocable for a period of more than one year, or beyond the termination date of the applicable collective agreement, whichever occurs sooner.
§ 186(c)(4).
This exception sets three, and only three, limits on dues-checkoff agreements, the "written assignment" referred to in the statute. Such agreements must be (1) individual and (2) in writing, and (3) they must allow employees to revoke them at least once a year or upon expiration of the applicable collective agreement. Apart from those limits, dues-checkoff authorizations are left to collective bargaining. States are not free to mandate additional restrictions for the benefit of unions, employers, or employees.
In addition to the summary affirmance in Sea Pak , the Supreme Court reached the same conclusion in a full opinion interpreting a nearly identical provision in the Railway Labor Act, 45 U.S.C. § 152 Eleventh (b), which was modeled on § 186(c)(4). Felter v. Southern Pacific Co. , 359 U.S. 326, 332-33 n.10, 79 S.Ct. 847, 3 L.Ed.2d 854 (1959).[5] The RLA provision permits dues-checkoff agreements in railroad employee unions under the same conditions set forth in § 186(c)(4).[6] In Felter , the Supreme Court interpreted those *502 terms to mean what Sea Pak held and what we hold today under § 186(c)(4) -Congress left to private actors whether, and if so, how, to formulate a dues-checkoff agreement within the basic parameters set forth in the federal statute. The individual employee must agree to the dues-checkoff, in writing, and it must be revocable at least once every year or at the expiration of the collective bargaining agreement, whichever occurs sooner.
The Felter Court explained that when Congress added Section 2 Eleventh (b) to the Railway Labor Act:
It thus became lawful to bargain collectively for "union-shop" and "checkoff" arrangements; but this power was made subject to limitations. The limitation here pertinent is that, by force of the proviso, the authority to make checkoff arrangements does not include authority to bind individual employees to submit to the checkoff. Any agreement was to be ineffective as to an employee who did not furnish the employer with a written assignment in favor of the labor organization, and any assignment made was to be "revocable in writing after the expiration of one year...." This failure to authorize agreements binding employees to submit to the checkoff was deliberate on the part of Congress. Proposals to that end were expressly rejected.... [The final bill allowed] the individual employee to decide for himself whether to submit to the checkoff, and whether to revoke an authorization after the expiration of one year.
359 U.S. at 331-32, 79 S.Ct. 847.
The Supreme Court then explained how this language placed in only private hands the decisions about additional terms of dues-checkoff authorizations:
The structure of § 2 Eleventh (b) then is simple: carriers and labor organizations are authorized to bargain for arrangements for a checkoff by the employer on behalf of the organization. Latitude is allowed in the terms of such arrangements, but not past the point such terms impinge upon the freedom expressly reserved to the individual employee to decide whether he will authorize the checkoff in his case. Similarly Congress consciously and deliberately chose to deny carriers and labor organizations authority to reach terms which would restrict the employee's complete freedom to revoke an assignment by a writing directed to the employer after one year. Congress was specifically concerned with keeping these areas of individual choice off the bargaining table. It is plainly our duty to effectuate this obvious intention of Congress....
Id. at 333, 79 S.Ct. 847. In Felter itself, the Court found that the employer and the union had violated those statutory ground rules by refusing to honor a timely revocation notice because it had not been submitted on a particular form. Id. at 330, 79 S.Ct. 847.
Most relevant to this case, however, Felter explained the rules that apply as long as private agreements do not contradict the statutory ground rules:
Of course, the parties may act to minimize the procedural problems caused by Congress' choice. Carriers and labor organizations *503 may set up procedures through the collective agreement for processing, between themselves, individual assignments and revocations received, and carriers may make reasonable designations, in or out of collective bargaining contracts, or agents to whom revocations may be sent.
Id. at 334-35, 79 S.Ct. 847. In other words, those matters not governed expressly by the statute were left to the collective bargaining process, just as in Sea Pak and Machinists .
3. Applying Machinists and Garmon Preemption Here
Here, Wisconsin acted to give employees like Lisa Aplin an additional statutory right under State law: the ability to cancel their duly authorized dues-checkoff agreements mid-year on just thirty days' notice. Wis. Stat. § 111.06(1)(i). The problem is that the Taft-Hartley Act leaves it to private actors-and not the State-to decide how long the dues-checkoff authorization should last, as long as the authorization is individual, in writing, and not irrevocable for longer than one year. 29 U.S.C. § 186(c)(4). The State's attempt to add additional regulatory requirements for dues-checkoffs, and thus to change the scope of permissible collective bargaining, is preempted.
A strong case could be made for Garmon preemption here because Act 1 can place employers under inconsistent State and federal expectations. After agreeing to a new collective bargaining agreement, employer John Deere was caught here in a federal-state bind. It had agreed, in light of federal law, to a collective bargaining agreement with the Machinists that incorporated by reference dues-checkoff agreements irrevocable for one year. Because this decision was inconsistent with Wisconsin's thirty-day revocability requirement, John Deere was told that it could be found responsible for committing an unfair labor practice under State law. But if, after executing the collective bargaining agreement, John Deere had decided to ignore its requirements and to comply with Act 1 instead, it could have been brought before the National Labor Relations Board by the union for committing a federal unfair labor practice. See, e.g., Metalcraft of Mayville, Inc. and District Lodge No. 10, Int'l Assoc. of Machinists & Aerospace Workers of Am. , No. 18-CA-178322, 2017 WL 956627 (N.L.R.B. Div. of Judges Mar. 10, 2017) (analyzing complaint brought by same union against different employer in wake of Act 1). Garmon preemption is supposed to prevent just this sort of conflict between State law and the NLRB's authority. See Brown , 554 U.S. at 65, 128 S.Ct. 2408.[7]
The State responds that there is a simple solution that would allow an employer to resolve this conflict. In the bargaining process, the State says, the employer could simply refuse to agree to any irrevocability period longer than thirty days. That is true in theory, but this argument *504 shows clearly why the State law is preempted under Machinists . Under the Taft-Hartley Act, the State simply is not allowed to impose its own view of how best to balance the interests of labor and management in zones that Congress deliberately left for resolution by collective bargaining. Machinists , 427 U.S. at 149-50, 96 S.Ct. 2548 (both NLRB and States "are without authority to attempt to introduce some standard of properly balanced bargaining power" in such areas) (quotation marks omitted), quoting N.L.R.B. v. Insurance Agents , 361 U.S. 477, 497, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960). Wisconsin's Act 1 tries to short-circuit the bargaining process by telling John Deere and the union they must use a dues-checkoff irrevocability period much shorter than federal law would otherwise permit.
As explained above, Machinists applies a rule of field preemption in areas that "Congress intended [to] be unregulated" by the NLRB or the States. See Brown , 554 U.S. at 65, 128 S.Ct. 2408 (quotation marks omitted), quoting Machinists , 427 U.S. at 140, 96 S.Ct. 2548. As Felter explained, the text and structure of Taft-Hartley's dues-checkoff provision do precisely that-employers and labor organizations "are authorized to bargain for arrangements for a checkoff by the employer on behalf of the organization," and it is "expressly reserved to the individual employee to decide whether he will authorize the checkoff in his case." 359 U.S. at 333, 79 S.Ct. 847. That leaves no room for Wisconsin to impose its own regulations in this same field. As in Felter , it "is plainly our duty to effectuate this obvious intention of Congress," id. , and to keep State law from invading this zone that Congress deliberately left to private actors.
C. The State's Arguments for an Exception
The State offers two more arguments to shield Wis. Stat. § 111.06(1)(i) from preemption. It first argues that preemption analysis should not apply to State dues-checkoff laws because 29 U.S.C. § 186(c)(4), is only an exception to a criminal prohibition against bribery and corruption. Second, the State argues that Taft-Hartley's preemption exemption for State "right-to-work"/mandatory union security agreement laws, § 164(b), applies not only to the kind of agreements mentioned in its text, but also to State laws regulating the terms of dues-checkoff authorizations. Neither argument finds support in the statute or in the Supreme Court's labor law decisions.
1. Section 186 's Preemptive Scope
First, as recounted above, Taft-Hartley's prohibition on employers and their agents giving "any money or other thing of value" to unions in § 186(a) was designed to fight corruption. The exception in § 186(c)(4) goes further, though. It also sets regulatory terms and conditions for lawful dues-checkoffs: "Provided , That the employer has received from each employee, on whose account such deductions are made, a written assignment which shall not be irrevocable for a period of more than one year[.]" This proviso shows a regulatory intent, not just a narrowing of the scope of § 186(a) 's criminal liability.[8]
*505 Section 186 is not a generic criminal statute applicable across many different potential contexts, comparable to say, mail or wire fraud. Next to Taft-Hartley's other provisions, the scope, exceptions, and location of § 186 show that it seeks primarily to regulate the interaction between employers and employee representatives, including some key terms of dues-checkoff authorizations. The fact that some violations of these policies may be felonies, see § 186(d), reflects the depth of Congress's commitment to these policy choices. It does not show a choice to limit this section's preemptive effect.
In addition, Machinists does not suggest that certain parts of Taft-Hartley should be treated differently in terms of preemption. Where Congress deliberately left choices to private actors, neither the State nor the NLRB may intervene. See Machinists , 427 U.S. at 140 & n.4, 96 S.Ct. 2548. Even public policy and regulatory decisions in other areas of the law can be preempted under Machinists if they have an impact on the collective bargaining process. See above at 498-500.
Finally, by attempting to regulate the revocation period of dues-checkoff authorizations, Act 1 is not a "state law[ ] of general application" like minimum-wage laws or minimum labor standards laws, which are generally not preempted. See Metropolitan Life Ins. Co. v. Massachusetts , 471 U.S. 724, 753, 755, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985). Here, Wisconsin seeks to modify a specific federal labor policy choice made in 29 U.S.C. § 186(c)(4), not to enact generally applicable health insurance standards, as in Metropolitan Life , see 471 U.S. at 727, 105 S.Ct. 2380, or to impose "a minimum labor standard which does not interfere with the collective bargaining process," as described in Shannon , 549 F.3d at 1129. This public policy decision in Wis. Stat. § 111.06(1)(i) -to narrow the scope of bargaining between the employer and the union-is preempted.
2. The Exception for "Right-to-Work"/Union Security Agreements
The State also contends that Wis. Stat. § 111.06(1)(i) is permissible because Taft-Hartley's § 14(b) expressly permits States to outlaw mandatory union security agreements in "right-to-work" laws. 29 U.S.C. § 164(b) ; see also Sweeney v. Pence , 767 F.3d 654, 658-59 (7th Cir. 2014) (describing history of § 164(b) ). Whether to allow "agreements requiring membership in a labor organization as a condition of employment" is a policy choice that Congress reserved to the States in that provision. § 164(b).[9] Wisconsin contends that the dues-checkoff authorization at issue here is a "maintenance of membership" device best thought of as a union security agreement subject to § 164(b) 's preemption exception. Alternatively, the State contends that § 111.06(1)(i) 's thirty-day maximum is one of the "appropriate tools" the State can use in asserting the policy freedom granted by Taft-Hartley. See Chamber of Commerce of United States v. Whiting , 563 U.S. 582, 600-01, 131 S.Ct. 1968, 179 L.Ed.2d 1031 (2011) (plurality opinion).
These arguments depend on the mistaken premise that dues-checkoff authorizations are union security agreements, i.e., "agreements requiring membership in a labor organization as a condition of em ployment *506 ," as set forth in the text of § 164(b) (emphasis added). They are not. Dues-checkoff authorizations are optional payroll deduction contracts between employers and individual employees, similar to health insurance premium payroll deductions or retirement savings arrangements. Checkoffs can be mentioned in a collective bargaining agreement, but they need not be. See Columbia College Chicago v. N.L.R.B. , 847 F.3d 547, 552-53 (7th Cir. 2017) (explaining that NLRA requires bargaining but not specific contractual outcomes). Unlike public-sector employees subject to collective bargaining agreements, private sector employees cannot be forced to agree to these payroll deductions. Compare Davenport v. Washington Educ. Ass'n , 551 U.S. 177, 181-82, 127 S.Ct. 2372, 168 L.Ed.2d 71 (2007), citing Wash. Rev. Code § 41.59.100 (2006) ("the employer shall enforce it by deducting from the salary" of employees), with 29 U.S.C. § 186(c)(4) (requiring employer to have "received from each employee ... a written assignment").
In both Sea Pak and Felter , the Supreme Court has illustrated the difference between dues-checkoff authorizations and union security agreements, i.e., union-shop or agency-shop provisions. Neither Taft-Hartley nor the Railway Labor Act in Felter equates dues-checkoffs with compulsory union membership. In fact, Felter observed:
The Act makes no formal relationship between a union-shop arrangement and a checkoff arrangement; under [the Act] the parties can negotiate either one without the other, if they are so disposed. And of course, a labor organization member who is subject to a union-shop arrangement need not subscribe to the checkoff; he can maintain his standing by paying his dues personally.
359 U.S. at 337 n.12, 79 S.Ct. 847 ; see also Dkt. 30-1 at 7 (collective bargaining agreement in this case provided that "if no such authorization is in effect, [a member] must pay his membership dues directly to the Union"). By summarily affirming the district court's § 164(b) discussion in Sea Pak , the Supreme Court endorsed the conclusion that § 164(b)"reaches no further" than its terms. 300 F.Supp. at 1201. "Checkoff authorizations irrevocable for one year after [their effective] date do not amount to compulsory unionism as to employees who wish to withdraw from membership prior to that time." Id.[10]
To counter these points, the State relies on Whiting , a case about federal immigration law and an Arizona business licensing statute, for the idea that it can use "appropriate tools to exercise [the] authority" granted under federal labor law in § 164(b). 563 U.S. at 600-01, 131 S.Ct. 1968 (plurality opinion) (discussing 8 U.S.C. § 1324a(h)(2), which permits States to impose "civil or criminal sanctions" on "those who employ ... unauthorized *507 aliens" provided this is done "through licensing and similar laws").
Congress did not write § 164(b) nearly as broadly as it wrote the statute in Whiting . Courts have rejected reliance on § 164(b) to save State statutes that veered beyond the provision's express scope: agreements between labor and management designed to prevent workers from free-riding on a union's services. See Idaho Bldg. & Const. Trades Council v. Inland Pacific Chapter of Assoc. Builders & Contractors , 801 F.3d 950, 954, 958 (9th Cir. 2015), citing Oil, Chem. & Atomic Workers Int'l Union v. Mobil Oil Corp. , 426 U.S. 407, 409 & nn.1 & 2, 416-17, 96 S.Ct. 2140, 48 L.Ed.2d 736 (1976) (explaining free-rider problem solved by union-shop and agency-shop agreements); see also Beck , 487 U.S. at 744, 746, 748-49, 108 S.Ct. 2641 (explaining that under Taft-Hartley's nationwide policy, which outlawed closed-shop agreements where union membership was a pre -condition for employment, "Congress authorized compulsory unionism only to the extent necessary to ensure that those who enjoy union-negotiated benefits contribute to their cost").
There is no such free-rider concern here. Wisconsin is seeking to modify the terms of voluntary payroll deductions involving an employer and its employee, not mandatory union- or agency-shop requirements that the employer and the union agree to impose on all employees. We know this from the terms of Act 1 itself. Its language invoking the power granted by § 164(b) came in the "right-to-work"/union security agreements provision. 2015 Wis. Act 1, § 5, codified at Wis. Stat. § 111.04(3)(a).
In Sweeney , we described the States' § 164(b) freedom as "extensive," 767 F.3d at 660, but the Supreme Court has made clear that before that freedom can apply, there must actually be a proper union security agreement in dispute: "state power, recognized by § 14(b), begins only with actual negotiation and execution of the type of agreement described by § 14(b) . Absent such an agreement, conduct arguably an unfair labor practice would be a matter for the National Labor Relations Board under Garmon ." Retail Clerks Int'l Ass'n Local 1625 v. Schermerhorn , 375 U.S. 96, 105, 84 S.Ct. 219, 11 L.Ed.2d 179 (1963) ( Retail Clerks II ) (emphasis in original). This § 164(b) authority also applies "only where State and federal power are concurrent." Algoma Plywood & Veneer Co. v. Wis. Employment Relations Bd. , 336 U.S. 301, 315, 69 S.Ct. 584, 93 L.Ed. 691 (1949) ; 29 U.S.C. §§ 158(a)(3), 164(b). That is not the case here with respect to dues-checkoff authorizations. Section 164(b) does not authorize States to regulate other arrangements not covered by its terms, such as dues-checkoff authorizations.
Conclusion
In light of Sea Pak , Machinists , and the Supreme Court's other labor preemption decisions, 29 U.S.C. § 186(c)(4) preempts Wis. Stat. § 111.06(1)(i). The judgment of the district court reaching that conclusion and enjoining enforcement of the State statute is
AFFIRMED.

Schimel followed our decision in Sweeney v. Pence , 767 F.3d 654 (7th Cir. 2014), where a divided panel upheld an identical Indiana law, and rehearing en banc was denied by an equally divided court.

The district court also noted that the original House-passed version of § 186(c)(4) would have made dues-checkoffs "revocable by the employee at any time upon thirty days written notice to the employer," Sea Pak , 300 F.Supp. at 1200 -the same policy Wisconsin has attempted to impose here. The final version of § 186(c)(4) allowed the maximum period to be as long as a full year. The district court concluded: "I cannot be persuaded that Federal preemption fails merely because Congress saw fit to adopt a less liberal power of revocation" in setting ground rules for dues-checkoff authorizations. Id.

In so holding, the Sea Pak district court interpreted § 186(c)(4) the same way the Supreme Court had already read a nearly identical provision in the Railway Labor Act in Felter , see 359 U.S. at 330-31, 79 S.Ct. 847, discussed below at 501-03. The Sea Pak district court's reasoning also correctly anticipated the Supreme Court's decision seven years later in Machinists , 427 U.S. at 153, 96 S.Ct. 2548, where the Court found that certain aspects of the "federal regulatory scheme" of labor-management relations "leave the parties free" from "state attempts to influence the substantive terms of collective bargaining agreements" and from such attempts by the National Labor Relations Board.

The employer-appellant in Sea Pak presented the following questions to the Supreme Court, invoking mandatory appellate jurisdiction under 28 U.S.C. § 1254(2) (1970):
A. Whether the Georgia Statute requiring that dues assignments be revocable at will is in conflict with or preempted by Section 302(c)(4) of the Labor Management Relations Act.
B. Whether the Georgia Statute is a valid exercise of the authority reserved to the Georgia legislature by Section 14(b) of the Labor Management Relations Act, and is, therefore not saved from preemption.
Statement as to Jurisdiction for the Appellant at 5, Sea Pak , 400 U.S. 985 (No. 70-463), 1970 WL 136846, at *4. The issues presented here are indistinguishable. The Georgia law made dues-checkoffs "revocable at the will of the employee," Sea Pak , 300 F. Supp. at 1199, while Wis. Stat. § 111.06(1)(i) grants an at-will cancellation right to employees, to take effect in thirty days. This thirty-day delay is a distinction without a difference. Both statutes operate to shorten considerably the irrevocability period of dues-checkoff agreements otherwise permitted under Taft-Hartley.

Where RLA and NRLA provisions "are in all material respects identical," the Supreme Court has used RLA cases as a guide to the NLRA and vice versa. See Communications Workers of Am. v. Beck , 487 U.S. 735, 745, 108 S.Ct. 2641, 101 L.Ed.2d 634 (1988) (applying RLA analysis to materially identical NLRA provision), citing Ellis v. B'hood of Railway, Airline & Steamship Clerks , 466 U.S. 435, 452 n.13, 104 S.Ct. 1883, 80 L.Ed.2d 428 (1984) (applying NLRA analysis to "equivalent provision" of the RLA).

Notwithstanding any other provisions ... a labor organization ... shall be permitted to make agreements providing for the deduction ... from the wages of its or their employees ... any periodic dues ... Provided , That no such agreement shall be effective with respect to any individual employee until he shall have furnished the employer with a written assignment to the labor organization of such membership dues, initiation fees, and assessments, which shall be revocable in writing after the expiration of one year or upon the termination date of the applicable collective bargaining agreement, whichever occurs sooner.
Pub. L. No. 81-914, ch. 1220, 64 Stat. 1238 (1951), codified at 45 U.S.C. § 152 Eleventh (b).

Another argument in favor of Garmon preemption is that the precise terms of dues-checkoff agreements might be considered a wage-related term of employment, and thus a mandatory subject of bargaining under the NLRA. 29 U.S.C. § 158(a)(5), (d) ; Garmon , 359 U.S. at 245, 79 S.Ct. 773 ("When an activity is arguably subject to § 7 or § 8 of the Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board"). We have equated the two before. See Office & Prof. Employees Int'l. Union, Local 95 v. Wood Cty. Tel. Co. , 408 F.3d 314, 317 (7th Cir. 2005) (distinguishing "between dues checkoffs and other terms and conditions of employment," but only with respect to the "express-contractual-authorization requirement" for checkoffs). Since Sea Pak and Machinists provide such a clear answer to the issue presented in this case, we do not need to explore Garmon preemption in any more detail.

The exception that immediately follows, § 186(c)(5), regarding union trust funds, provides another example of regulatory choices made in this fashion. Its "Provided " language lists permissible uses for trust funds, sets forth a process for approving trust fund plans, and even empowers district courts to appoint "an impartial umpire" to settle certain kinds of disputes. This structure is used elsewhere in federal labor law. See, e.g., § 158(a)(3) (union security agreements and unfair labor practices).

§ 164(b) reads in full:
Nothing in this subchapter shall be construed as authorizing the execution or application of agreements requiring membership in a labor organization as a condition of employment in any State or Territory in which such execution or application is prohibited by State or Territorial law.

On the facts of this case, Aplin's dues-checkoff authorization cannot reasonably be considered a union security device. She would not have faced any consequences from the union or her employer if she had never authorized it. It was also, by its express terms, "not a quid pro quo for ... union membership." Dkt. 30-3. The dues-checkoff authorization might have become a term of her employment once Aplin signed it, but it was never "a condition of employment" as that term is used in § 164(b) -the authorization was a freely adopted optional contractual arrangement with her employer, with its own cancellation terms and conditions that fully complied with federal law. See Dkt. 30-1 at 7; Dkt. 30-3; 29 U.S.C. § 186(c)(4). Aplin enjoyed the convenience of a payroll deduction for thirteen years. Only in the last few months of the arrangement did she seek to change it. Sea Pak specifically rejected the notion that this state of affairs amounts to compulsory union membership.